## J. H. ADAMS v. THE STATE.

### No. 3022. Decided November 23, 1904.

**1.—Murder—Argument of Counsel—Practice.**

Unless the appellant asked for a special charge that the jury disregard the argument of State's counsel objected to by the defense, the matter will not be considered on appeal.

**2.—Same—Objection to Counsel's Remarks—Practice.**

The practice of calling the trial judge's attention to illegitimate argument in an undertone or in writing, in such manner as not to call the attention of the jury to the question is commended.

**3.—Same—Objections to Charge Too General—Practice.**

Where exceptions to the court's charge on malice are too general, they will not be considered on appeal.

**4.—Charge of the Court—Reasonable Doubt.**

The court correctly charged that a defendant in a criminal case is presumed to be innocent until his guilt is established by legal evidence beyond a reasonable doubt, and in case you have a reasonable doubt as to defendant's guilt, you will acquit him and say by your verdict not guilty.

**5.—Same—Evidence—Threats of Deceased—Inducements for Threats.**

Where the witness for the defendant in a case of murder was permitted to testify to threats of deceased against the defendant, he should have been permitted to testify what deceased told him immediately before making the threat about which the witness had testified and in connection therewith, to the effect that deceased referred to some trouble that he had had with one B. and defendant and others, and mentioned a report that defendant had made to B. of a statement deceased had made to defendant concerning B.'s wife, and that defendant had made a true and correct report of what deceased had said about B.'s wife; and that on account thereof he was angered and intended to kill defendant; to exclude this was reversible error.

**6.—Same—Charge of Court—Self-Defense—Appearance of Danger.**

A charge on self-defense, which omits, from this application of the law to the facts, the reasonable appearance of danger as viewed by the defendant, and only authorized the jury to acquit if they believed deceased had made an attack or was about to do so, is reversible error, and the same principle applies to threats.

Appeal from the District Court of Montgomery. Tried below before Hon. L. B. Hightower.

Appeal from a conviction of murder in the second degree; penalty, five years imprisonment in the penitentiary.

The defendant sought to justify the homicide on the ground of self-defense and introduced in evidence the communicated threats of deceased, made at different times, that he intended to kill defendant. Defendant's wife testified that about a week, or such matter, before the homicide the deceased had attempted to outrage her and that she told her husband about it, after he had had the altercation with the deceased on the morning of the day of the homicide. That deceased told her at the time of the attempted outrage that if she told on him, he would kill her husband, that he had been waiting to kill him anyway; and that she told her husband. Defendant testified corroborating his wife's testimony and that on the day of the homicide the deceased had

borrowed a gun and said that he wanted to kill defendant; that before he shot deceased, whom he met unexpectedly, he noticed deceased coming at him with an open knife.

P. W. Williams, being sworn, testified for the State as follows: I remember the day upon which J. E. Ariola was killed. A short while after sun up on the day of the killing I was at the gate of the yard fence of the defendant, J. H. Adams, near Longstreet, in Montgomery County, Texas, talking to him and making arrangements to get him to go over and fix a well for me, when some one whom defendant called Ed Ariola came up to where the defendant and I were talking. I have never seen this party before, but the defendant said before he got up to where we were, "It is Ed Ariola. I reckon he must be coming for his coat." This was the same person who was killed later in the day at Mr. G. W. Scarbrough's. I saw his body at Scarbrough's after he was killed and recognized it as being the same person who came to defendant's house that morning. When Ariola came up to where the defendant and I were at defendant's yard gate, he did not speak to either of us, but walked up and stood there for a while when the defendant said to him: "Ed, what was that you said about prosecuting me for killing a deer?" Whereupon Ariola said to the defendant: "Who told you that I said anything about prosecuting you for shooting a deer?" The defendant then said Mrs. Scarbrough told his wife that Ariola had stated that he was going to prosecute him for killing a deer and the defendant thereupon called to his wife who was inside the house and when she came to the door the defendant asked her what it was Mrs. Scarbrough said about Ariola prosecuting him for shooting a deer and she replied that Mrs. Scarbrough had told her that Ariola said he meant to prosecute the defendant for shooting a deer. Ariola then remarked: "Mrs. Scarbrough is the lady," and reached into his pocket, drew his knife and opened it and started towards the defendant or somewhat in the direction of the defendant who was sitting on the corner of his yard fence and said as he went towards the fence: "Jim, you are starting up them damned tales again" and climbed up on the fence within about four or five feet of the defendant. The deceased seemed quite angry when he pulled his knife and made this remark. I did not see him do anything while he was on the fence except sit there with his knife open. In a little while the defendant got down on the inside of his yard and the deceased with his knife open also followed defendant and the defendant began to walk backwards and side ways toward the house and the deceased began to follow him. I did not see deceased's knife after he got down off the fence and started towards defendant. About this time I started to ride off and as I rode away I heard cursing in the defendant's yard and the voice sounded to me like the voice of Ariola. About two o'clock on this same day I was at G. W. Scarbrough's and saw the dead body of Ariola. I think the most practicable route from Adams' to Longstreet was by Scarbrough's. There was a neighborhood road leading from Adams to the Montgomery and Longstreet road, which

neighborhood road went right also along by the front of Scarbrough's
house and intersected the Montgomery and Longstreet road near Scar-
brough's house.  It was on or about the 30th day of June, 1899, that I
saw Ariola at the defendant's house and saw the dead body of Ariola
later in the day as above testified about, and it was in Montgomery
County, Texas, where I saw his dead body at Scarbrough's house.

G. W. Scarbrough, being sworn, testified for the State as follows:
I knew J. E. Ariola.  He had been stopping at my house for about two
or three days before he was killed in June, 1899.  He went off from
the house and was gone a while on the morning of the day he was killed.
I do not remember just what time he returned to my house that day,
but it was before dinner.  After dinner, he was at work on a wagon
tongue on the north end of the gallery of my house.  My house at that
time consisted of two double log rooms with a hall between facing north
and with gallery shed along the entire north end of the house; but only
the east end and the ·hall part of the gallery was floored, that part of the
gallery shed, on the west end or in front of the west room, being left
unfloored.  There was a sill at the front of this unfloored gallery shed,
and this sill was about twelve inches from the ground and it was in this
unfloored part that Ariola had been at work on the wagon tongue.  I
was at home when the killing occurred.  I was standing in my yard
between the north gallery and the gate, which was north of the house,
when Adams rode up.  When Adams came up near the gate, I said to
him: "Get down and come in."°  I had been on a horse trade with the
defendant.  I was to trade him a colt for the little mare he was riding.
·I wanted this mare for my children to ride to school.  When I told
the defendant to get down, he said he didn't know that he had time,
but threw the reins of his bridle over a stake of the fence and got down
and walked inside the gate.  I started out to where the pony was to
examine it, thinking we would make a horse trade, and in a few seconds
I heard the click of the gun and heard the gun fire and turned and
looked and saw the defendant a little over half way between the yard
gate and the gallery and saw Ariola with his hands thrown up over his
head falling backward towards the wall of the west end of the house.
I did not see the shots fired and did not see what Ariola was doing, if
anything, after Adams came, before the shot was fired.  Adams said
nothing after he got down until after the shot was fired, but immediately
after he fired the shot he said:  "Now, damn you, kill me."  I heard
deceased say nothing after Adams came.  Immediately after the shot
was fired, the defendant turned and walked to his horse, threw the reins
of the bridle over the horse's head, got on the horse, and rode away.  My
yard gate was about ten or fifteen steps from the front gallery and Adams
was maybe a little more than half way from the gate to the gallery when
he fired.  The deceased died immediately after the shot was fired.  I
could not tell you how far his head was from the wall as he lay there,
nor how far his feet were from the sill at the front of the unfloored gal-
lery.  I know that his feet were toward the sill and not far from it and

that his head was towards the wall of the house. He was shot in the arm and side. His arm was shot into and the load of shot passing through the arm entered the body. I don't know which side he was shot on. Several people came over to my house a short while after the shooting, among them being Jim Bay and P. W. Williams. On cross-examination witness stated that where deceased was killed there was lying, near the sill and close to his feet, his open knife. Witness did not see him use this knife in his work on the wagon tongue. Witness also stated that when deceased returned on the morning of the killing he said, "This is twice Adams has run on me in a rough way, and the next time he does it something has to be done?" Other witnesses testified to seeing the open knife, near the place of the homicide and one witness testified that he saw deceased using it while at work on the wagon tongue and that he had a gun there and probably had something in his hand when he was shot, but could not say that it was the knife.

The court's charge on self-defense was as follows:—

"A reasonable apprehension of death, or great bodily harm, will excuse a party in using all necessary force to protect his life or person, and it is not necessary that there should be actual danger, provided he acted upon a reasonable apprehension of danger as it appeared to him from his standpoint at the time, and in such case the party acting under such real or apparent danger is in no event bound to retreat in order to avoid the necessity of killing his assailant.

"If from the evidence you believe the defendant killed the said J. E. Ariola, but further believe that at the time of so doing the deceased had made, or was about to make an attack on him, which, from the manner and character of it, and the relative strength of the parties and the defendant's knowledge of the character and disposition of the deceased, caused him to have a reasonable expectation, or fear, of death or serious bodily injury, and that acting under such reasonable expectation or fear, the defendant killed the deceased, then you should acquit him; and if the deceased was armed at the time he was killed and was making such attack on defendant and if the weapon used by him and the manner of its use was such as were reasonably calculated to produce death or serious bodily harm, then the law presumes the deceased intended to murder or aimed to inflict bodily injury upon the defendant."

The court's charge on threats was as follows:—

"You are further instructed in connection with the law of self-defense that where a defendant accused of murder seeks to justify himself on the ground of threats by deceased against his own life, he is permitted to introduce evidence of the threats so made but the same shall not be regarded as affording a justification for the offense, unless it is shown that at the time of the homicide the person killed, by some act then done, manifested an intention to execute the threats so made.

"It is not practicable to fix on what the act manifesting the intentions of the deceased to execute his threats shall be; but it must be some act

reasonably calculated to induce the belief that the threatened attack was then commenced to be then executed.

"So, if from the evidence you believe that the deceased had made a threat or threats against the life of the defendant and that such threat or threats of deceased had before the homicide been communicated to the defendant, and further you find that at the time of the homicide the deceased by some act then done, manifested an intention to execute the threats so made against the defendant, then the defendant had the right under the law to shoot the deceased,—even unto death—and if you so find the fact to be, you will acquit the defendant and say by your verdict not guilty.

"But should you find from the evidence that the deceased had made threats against the life of the defendant and that the defendant knew of such threat or threats, or the same had been communicated to him before the homicide, yet unless you find from the evidence that the deceased, at the time of the homicide, was then doing some act manifesting an intention to execute the threat so made, the defendant cannot justify on the ground of threats against his life made by the deceased."

*Alf. Morriss* and *Dean, Humphrey & Powell*, for appellants.—The court erred in refusing to allow the defendant to prove by the witness Robert Pyle that when the deceased, J. E. Ariola, made the threat to take the defendant's life, which was testified to by said witness, the deceased, at the time he made said threat, and in connection therewith stated that what Adams had reported to Bill Bryant was true and that he, the said Ariola, had made the statement which the defendant told Bryant that he had made, but that the defendant caused him, the deceased, trouble by making such a statement, and that he intended to kill him for it. All of which more fully appears from defendant's bill of exceptions No. 1, which is here referred to and made a part hereof, Russell v. State, 11 Texas Crim. App., 288; Ball v. State, 14 S. W. Rep., 1012; 29 Texas Crim. App., 107.

On the proposition of the court's charge on self-defense, which was assigned as error: Gonzales v. State, 28 Texas Crim. App., 130; Weaver v. State, 19 Texas Crim. App., 547; Stewart v. State, 51 S. W. Rep., 907; Seely v. State, 63 S. W. Rep., 309; Graham v. State, 61 S. W. Rep., 714; Phipps v. State, 34 Texas Crim. Rep., 560; Terry v. State, 76 S. W. Rep., 928.

The charge of the court set out in the defendant's fifteenth assignment of error is further erroneous to the prejudice of the defendant in that it ignores altogether the doctrine of apparent necessity and of the defendant's right to act in case it reasonably appeared to him viewed from his standpoint at the time by some act done by the deceased that the threatened attack had then commenced to be then executed. Gonzales v. State, 28 Texas Crim. App., 130; Seeley v. State, 63 S. W. Rep., 309; Weaver v. State, 19 Texas Crim. App., 547.

The portion of the court's charge set forth in the fifteenth assignment

of error is further fundamentally erroneous to the great prejudice of the defendants in that the court therein authorized and instructed the jury to determine the defendant's right to act in his self-defense by the jury's conclusions as to whether the threatened attack was then begun to be then executed, without requiring that the jury view the facts and circumstances from the defendant's standpoint at the time he acted upon them and from no other standpoint, and without instructing the jury that the defendant had the right to act upon reasonable appearances of danger as viewed by him and from his standpoint.

*Howard Martin,* Assistant Attorney-General, for the State.

BROOKS, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of five years.

Bill number 1 complains that appellant placed the witness Robert Pyle upon the stand, and he testified that he knew defendant and deceased, and that a short time before the homicide, deceased had stated to witness that he intended to kill the damn scoundrel Jim Adams (defendant); and defendant proposed to prove by said witness that deceased stated that defendant had informed Bill Bryan of a statement which deceased had made concerning Bryan's wife; that deceased stated that what defendant had reported to Bryan that he had said about Bryan's wife was true, but that it had caused him trouble, and for that he expected to kill defendant. Defendant, to elicit said facts from said witness, in connection with and explanatory of the threats about which the witness had testified, asked witness, while upon the stand, the following question: "What did deceased say in connection with and preliminary to the threat about which you have testified, and what explanation, if any, did deceased make or why he intended to kill defendant." In answer to this question, witness would have stated, "That deceased told him immediately before making the threat about which he had testified, and in connection therewith, that deceased referred to some trouble that he had had with Bryan and defendant Adams and others, and mentioned a report that defendant had made to Bryan of a statement which deceased had made to defendant concerning Bryan's wife; and that defendant had made a true and correct report of what he had said about Bryan's wife." This bill has the following explanation, "That there was no objection made to the proof of the threat, to wit: that deceased intended to kill the damn scoundrel (defendant) but did object to what defendant had told one Bryant concerning reputed remark of deceased as to Bryant's wife because irrelevant, immaterial and involved the right of other issues wholly foreign to this case, and was evidently offered to prejudice the State's case." The fact that deceased said that what defendant had stated was true, does not throw any light upon the threat, or in any manner explain the threat, but as the learned trial court seems to indicate, would be injecting into the case an issue foreign to any issue

in the case. The declaration of deceased that he had made derogatory remarks of the wife, and defendant had reported said remarks to the husband, and for that reason he expected to kill defendant, is a germane issue and threat in the trial of this homicide. But the question as to whether or not the report was true or false as made by defendant cannot, in the nature of things, affect this case. The declarations show the animus of deceased towards defendant in a pertinent way, disassociated from his opinion as to the correctness of the declaration by defendant. We can not see in what way appellant was harmed by the exclusion of this testimony.

Bill number 2 complains of the argument of the county attorney to the jury; and the third bill is with reference to the argument of the district attorney. Under the qualifications of the court to the bills, and the fact that defendant did not ask any special charge instructing the jury to disregard said remarks, we cannot see how the remarks injured appellant.

The fourth bill complains that while the district attorney was making his speech to the jury, among other things, he stated: "There is nothing at all in this contention of insult to defendant's wife. This is a trumped up defense. I believe that this defendant is guilty of murder and murder in the first degree." "To which statement defendant then and there in open court excepted, because improper, prejudicial to defendant, because expressing an opinion to the jury as to the guilt or innocence of defendant." The district attorney appends this explanation to the bill: "I agree to this bill, with this statement: that no objection was urged in my presence and hearing to the above remarks; that no request was made in my presence and hearing that said remarks be disregarded by the jury, and no written request was made of the court to charge the jury not to regard such remarks, and if any exception at all was made, it was quietly done, to the court, and not within my hearing or knowledge." The court approves the bill with this explanation: "Approved with the explanation of the district attorney as part of this bill. Mr. Dean, counsel for defendant, did except to the remarks of the district attorney as quoted in this bill, but did so in an undertone to the court, stating at the time he excepted that his reason for making the exception to the court in such a manner was that he did not wish to disturb Mr. McCall in his argument before the jury." The statement of the district attorney, disassociated from the explanation of himself and trial court, does not occur to us to be prejudicial to the rights of appellant. As we understand, he is merely stating a conclusion drawn and deduced by him from the evidence produced upon the trial. But we desire to animadvert some upon the statement contained in the explanation, that the exception was not made in the presence and hearing of the district attorney, and the reason given by appellant's counsel for not doing so, was that he might not be disturbed in his argument. It is proper that exceptions to improper argument, or argument deemed improper, be made to the

court; and it is immaterial whether State's counsel hears the objection or not. The objection is addressed exclusively to the court, and it is the province of the court alone to rule upon it. We commend the practice of calling the trial court's attention to illegitimate argument in an undertone or in writing, in such a manner as not to call the attention of the jury to the question at all, because in practice we know that by so doing, it even makes manifest and more apparent the illegitimate argument complained of. However, in the explanation above we note there was no written request that the jury be instructed to disregard the remarks. There was no error in the ruling of the court.

In the sixth paragraph of the motion for new trial appellant objects to the court's charge on implied malice, because not a correct statement of the law, and is inapplicable to the facts of this case. And the 7th, 8th, 9th, 10th and 11th grounds of the motion complain upon the same general ground of the charge of the court. We have examined the charge very carefully, and in our opinion it is an admirable presentation of the law applicable to the facts in this case. Furthermore, said objections are too general to be considered by this court in passing upon an exception to the charge.

The 12th ground of the motion objects to a certain portion of the charge, "because it is not a correct statement of the law applicable to this case, and in attempting to apply the law to the facts of this case, the court in said portion of the charge ignored defendant's right to act upon the reasonable apprehension of danger as it appeared to him from his standpoint, and was not cured by any other portion of the charge." We do not think this latter criticism is correct, but the charge taken as a whole is a proper charge.

The 13th paragraph of the motion is, "that the court erred in that portion of the charge wherein the court attempted to state the law with reference to threats to the defendant's life, in case the jury found that deceased had threatened him." The objection to this clause is that it is not a correct statement of the law, and is prejudicial to defendant. An examination of the charge shows it is a clear and succinct statement of the law of threats, and we do not see any error in the same.

Appellant also excepts to the following portion of the charge: "Defendant in a criminal case is presumed to be innocent until his guilt is established by legal evidence beyond a reasonable doubt, and in case you have a reasonable doubt as to the defendant's guilt, you will acquit him, and say by your verdict not guilty. The objection to this charge is, that it is not a correct statement of the law, and is prejudicial to the defendant. How or in what way it could possibly be prejudicial to defendant or is not a correct statement of the law we are at a loss to know, it being the stereotyped statement of the reasonable doubt approved by this court in many cases.

The 15th, 16th and 17th grounds of the motion, complain of the verdict being contrary to the law and the evidence. We do not think there is any merit in this proposition; but the evidence shows a cow-

ardly killing of an industrious and unsuspecting Mexican. The clear preponderance of the evidence shows that at the time of the homicide he was engaged in working upon a wagon tongue for his employer, unaware of the stealthy approach of his assassin, and was shot down before he knew of his approach. It is true the defendant put these facts in issue by the testimony of the wife of appellant and his own testimony. This was a controverted question left for the jury, which they decided against appellant. In our opinion the verdict is amply supported by the evidence. The judgment is affirmed.

*Affirmed.*

### ON REHEARING.
#### December 20, 1904.

DAVIDSON, PRESIDING JUDGE.—Appellant insists there was error in affirming the judgment on a former day of this term; especially in that portion of the opinion wherein it was held that the trial court erred in refusing to permit the witness Pyle to explain the threat deceased uttered against appellant. Pyle did testify to the threat, but the statements made at the time, preceding and explanatory of the threat, were rejected. After a careful review of this matter, we are of opinion this court was in error in sustaining this action of the trial court. The bill recites that this witness would have stated, "that deceased told him immediately before making the threat about which he testified, and in connection therewith, that deceased referred to some trouble that he had had with Bryan, and defendant Adams and others, and mentioned a report defendant had made to Bryan of a statement which deceased had made to defendant concerning Bryan's wife, and that defendant had made a true and correct report of what he had said about Bryan's wife." The report deceased had made about Bryan's wife was insulting toward her, and impeaching her chastity. This had been repeated by appellant, which greatly enraged deceased. Appellant was permitted to prove the threat. The nature of the threat and the inducing cause for the threat were legitimate facts to go to the jury. Its tendency was to throw light upon the transaction and explain the reasons for the threat. Under our statute, whenever part of a conversation is introduced, the entire conversation is admissible, if it tends to explain or make clear the purport of the conversation. Deceased stated he had made the statements about Bryan's wife, and that they were true, and that he intended to kill defendant because he had repeated his statements. It is not legitimate to take out a portion of the inducements for the threat; it should all go to the jury in order that they may be able to weigh the force of the threat, and its probable seriousness.

The charge on self-defense is criticised. Without discussing it in the original opinion, the charge was held sufficient when viewed as a whole. After reviewing the charge, we are of opinion it is defective in not presenting the theory of self-defense as the facts appeared to

defendant at the time he fired the fatal shot. The court applying the law informed the jury that appellant would be entitled to an acquittal, if the deceased had made an attack or was about to make an attack on defendant. Omitting from this application of the law to the facts, the reasonable appearance of danger as viewed by defendant: in other words, it only authorized the jury to acquit if they believed deceased had made an attack or was about to make an atatck. This same vice is in the charge in regard to threats. Self-defense from apparent danger is always from the standpoint of apprehension by appellant that the deceased was about to make an assault or attack on him, and in this case it was with a knife. He had not reached defendant, and defendant was led to believe that he was going to attack him by reason of his actions and movements at the time, and previous threats. What the jury may think of the reasonableness of the appearances of danger is not the criterion of self-defense. It is the impression or effect in the mind of accused and his belief in the appearances of danger. The charge instead of giving the reasonable appearance of danger, as viewed by defendant, leaves it to be viewed by the jury as they believe or view such danger. Upon another trial, the jury should be plainly instructed that they should view the question of self-defense in regard to the appearances of danger, from the standpoint of defendant. We are of opinion that the original opinion is wrong in these respects and that a rehearing ought to be granted, which is accordingly done, and the judgment is now reversed and the cause remanded.

Brooks, Judge, absent.

*Reversed and remanded.*