## Max Miller v. The State.

No. 3785. Decided November 13, 1907.

**1.—Murder in First Degree—Change of Venue—Bill of Exceptions.**

Where upon trial for murder it appeared from the record on appeal that the appellant used all the diligence possible to have his bill of exceptions to the ruling of the court in refusing a change of venue filed in term time, and that the evidence on the motion for change of venue entitled him to such change of venue, the judgment of the lower court must be reversed.

**2.—Same—Charge of Court—Temporary Insanity—Recent Use of Intoxicating Liquor.**

Where upon trial for murder the evidence tended to show temporary insanity produced by the recent use of ardent spirits by the defendant at the time of the homicide, the court should have charged article 41 of the Penal Code with reference to the use of intoxicants.

**3.—Same—Manslaughter—Charge of Court—Adequate Cause.**

Where upon trial for murder the evidence showed that just before the homicide the defendant became enraged at the conduct of deceased for interfering in the quarrel between defendant and his wife, and that the environments of the parties were such to lead the defendant to believe that the deceased was about to secure a pistol, the court should have charged upon the law of manslaughter.

**4.—Same—Charge of Court—Accidental Killing—Statutes Construed.**

See state of facts in opinion which did not call for a charge under articles 681 and 682 of the Penal Code with reference to excusable homicide, but article 45 with reference to accidental killing should have been given.

**5.—Same—Charge of Court—Weight of Evidence.**

Upon trial for murder, the evidence showed that shortly prior to the homicide defendant and his wife were quarreling and he struck her with a pistol and became very much excited and pointed his pistol at a stranger for his supposed interference in the family disturbance, and that shortly afterwards defendant meeting deceased entered into a quarrel with him for a similar reason; a charge of the court that the jury might consider these facts for what they were worth was on the weight of the evidence and reversible error.

Appeal from the District Court of El Paso. Tried below before the Hon. James R. Harper.

Appeal from a conviction of murder in the first degree; penalty, life imprisonment in the penitentiary.

The opinion states the case.

*F. G. Morris, Geo. O. Sweeney* and *M. W. Stanton,* for appellant.—
On question of change of venue: Cortez v. State, 44 Texas Crim. Rep.,

169; Lax v. State, 46 Texas Crim. Rep., 628. On question of charge on adequate cause: Sherar v. State, 30 Texas Crim. App., 349, 17 S. W. Rep., 621; Garner v. State, 77 S. W. Rep., 798. On the question of accidental killing, or negligent homicide: Reddick v. State, 47 S. W. Rep., 994; Brittain v. State, 36 Texas Crim. Rep., 406; Howard v. State, 25 Texas Crim. App., 686.

Upon the issue as to whether or not the court should have submitted the law in reference to temporary insanity produced by the recent voluntary use of intoxicating liquors: Evers v. State, 31 Texas Crim. Rep., 318; Campos v. State, 50 Texas Crim. Rep., 289, 17 Texas Ct. Rep., 76; Phillips v. State, 50 Texas Crim. Rep., 127, 17 Texas Ct. Rep., 757. As to necessity of charge on manslaughter in this case: Jones v. State, 29 Texas Crim. App., 338.

*F. J. McCord,* Assistant Attorney-General, and *Geo. Estes,* District Attorney, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of murder in the first degree, his punishment being assessed at confinement in the penitentiary for life.

He was charged with the killing of J. F. Turley on the night of October 1, 1906, and the evidence shows that it occurred in a saloon belonging to J. F. Manning, and that appellant was a saloon keeper in the City of El Paso and had been conducting such business for several years prior to the tragedy. He put in evidence, his general reputation as being a quiet peaceable man and sustained it by witnesses. On the day, preceding the homicide at night, it was "pay day" and appellant is shown by some of the witnesses to have been drinking considerably, occasioned largely by the fact that as the parties would pay their bills, they would invite him to drink. Leaving his place of business after night he started home and on reaching a point opposite the saloon, or "family" beer saloon of Manning, his attention was attracted by a woman's voice in that saloon. He crossed the street and asked Manning if his, appellant's wife, was in the saloon. Manning replied that she was and made some statement to the effect that he had been trying to get her away. It seems that appellant understood that she had been detaining Manning for some time by remaining in the saloon, Manning desiring to close up. Manning suggested that he would go into the saloon and tell Mrs. Miller to come out, but appellant requested Manning to hold a package which he had in his hand and that he, appellant, would go in and bring his wife out. Upon entering the saloon, he found his wife standing with a beer glass in her hand, and he reproved her for being in the saloon and invited her out.

Appellant contends that she resisted but finally they left and went on up the street and during their controversy, or quarrel in the street, appellant struck her with a pistol. They then proceeded home and en route an altercation arose between appellant and one Meyers, and

it is stated that appellant presented a pistol towards and threatened to shoot him. What occurred at this point is unnecessary to be stated further. Upon arriving at their home, appellant and his wife continued their quarrel, he reproving her for going into the saloon, especially for keeping the saloon open and Manning in waiting. She denied keeping Manning in waiting and denied buying beer for "bums" around the saloon, as appellant charged. To satisfy her, they returned to Manning's saloon in about ten or fifteen minutes. There were four men in the rear room of the saloon at the time they entered, and there is conflicting testimony as to whether Miller saw them at that time. They were sitting at a table playing cards.

Appellant contends he saw no one in the saloon at the time he returned with his wife, except Manning, although the four men were in the rear or wine room card playing. All of these were strangers to him and no conversation had occurred between appellant and them on his first visit to the saloon. All the controversy on the first visit to the saloon while in it seems to have occurred between appellant and his wife. When appellant and his wife returned to the saloon they had a controversy and talked with Manning near the south end of the bar in the front room. In regard to this conversation, Manning states substantially that appellant seems to have understood that he, Manning, charged Mrs. Miller with keeping him waiting when he wanted to close the saloon. The counter or front bar extended through the partition wall into the rear room to the north where the deceased and the other three parties were. There was no conversation between appellant and the men in the wine room for sometime after the appellant and his wife reached the saloon on the second visit, nor until appellant charged his wife with hanging around the saloon buying beer for "bums." When this charge was made one of the men in the wine room, named Censor, remarked that "Mrs. Miller never bought any beer for us," referring to the parties in the rear room. Miller replied by saying that he should not "butt in," and the State introduces evidence to the effect that he, appellant, applied a vile epithet to Censor. The conversation was continued between parties in the front part of the saloon and nothing more was said by the parties in the rear room for a minute or two when appellant again made a similar charge in reference to his wife buying beer, when deceased replied that Mrs. Miller had not bought any beer for them and that they were working-men and paid for their own beer. The State at this point contended that appellant applied to deceased, a vile epithet and drew his pistol. The contention of appellant, at this point is, that when he replied to deceased, he did not call him a vile name and that the deceased sprang up and applied a vile epithet to him, appellant. The testimony is in conflict at this point. There is also a conflict in the testimony as to what time Miller drew his pistol, the State contending that he drew it at the time he spoke to deceased; appellant that he did not draw it until afterward. There is some confusion about the testimony as to whether the parties could

have seen appellant with the pistol even if he had drawn it. The testimony for the State is to the effect that when appellant drew his pistol, deceased jumped up, advanced towards the door between the rear room and the front room, but suddenly turned to the left and passed behind the bar in a crouching or bending position. It is further in testimony for the State that before he crouched or bent down, deceased put his hands on the front bar near the partition and talked to appellant and requested him not to shoot, and then dodged down behind the counter to avoid being shot by appellant.

The contention of the defense at this point is that when the deceased passed behind the counter he was seeking to get a pistol, and it is further shown in this connection that it is customary to keep pistols in these saloons behind the counter. The testimony seems to be practically harmonious to the effect that appellant looked over the counter and told the deceased to get up several times; and it is further shown by the State that deceased said he was unarmed and didn't want to fight, or words to that effect, and that appellant told him, a number of times "to get up then." It is further shown that appellant was, during the time, looking over the counter holding his pistol in position and that he could have shot at any time while so looking but did not. Finally deceased did straighten up and as he did so, a shot was fired which resulted in deceased's death. That appellant immediately stated to him to get up "you are not hurt" or words to that effect, and perhaps repeated the statement several times, then walked around behind the bar where deceased was, turned him over and saw blood and left the saloon. The defense's testimony is to the effect that he believed that the deceased was after a pistol when he went behind the bar. It is further in evidence that the appellant was never out of the front room and that the deceased left the table where he was sitting with the other parties in the rear room and passed in behind the bar until he was some distance in the front room. Appellant claims at the time that he was only holding the pistol in readiness thinking that deceased had gone behind the bar to get the pistol and that he did not intend to use his pistol unless forced to do so by the conduct of the deceased, as a means of defending his life. And it is further contended by appellant that at the time the shot was fired, the pistol went off accidentally and that he did not intend to shoot when it was fired. It was also in evidence that appellant put his foot on a spittoon and looked over the bar at deceased and that he could have shot the deceased at any time while he was under the bar; that there was nothing to prevent him from doing so.

There is also evidence in the record to the effect that appellant was drinking on the night of the homicide, and had been drinking pretty much all day, one of the witnesses swearing that he had taken perhaps, as many as fifty drinks of beer, wine and whisky. Another witness testified that just after the homicide he undertook to interview appellant in regard to it, but he was in such a condition he could make no

coherent statement; that his conversation was disjointed and unintelligible. Other evidence was introduced that he was drunk. This perhaps, is a sufficient statement to call in review questions suggested for reversal.

Appellant presented an application for a change of venue, which was overruled and a bill of exceptions reserved. This bill was presented to the judge on the first of January, the court adjourning on the 5th. An urgent request was made by counsel for appellant, of the court to have the State's counsel pass upon this and three other bills, in order that they might be filed before the court adjourned. Without going into a detailed statement, this is certified by the court and sworn to by the official stenographer and a stenographer of appellant's counsel, and both attorneys who defended appellant. The district judge certifies in substance that he thought by entering a general order to file bills of exception, after adjournment of court, all of said bills could be filed and approved, under the last acts of the Legislature, including the bill refusing a change of venue, and thereupon did not order prompt action on the matter. And he further certifies that this covers bills of exception other than that with reference to a change of venue, and closes his certificate in the following language: "I further certify that the failure to examine, approve and file said bills of exception, and especially bills of exception 1 and 4 both inclusive, was not caused by any negligence on the part of said defendant, Max Miller, or his attorneys."

There is a statute which especially relates to bill of exceptions reserved to the ruling of the court refusing a change of venue, which statute provides that such bill shall include the testimony introduced on the motion for a change of venue and to be filed in term time. It has been held that the general statute with reference to allowing time after adjournment of the court, does not apply to bills of exception in regard to motions for a change of venue. It would seem from what has been stated that appellant used all the diligence possible to have this, as well as other bills prepared and filed during the term of the court and there was ample time to have done so if proper action had been taken and that he is deprived of his bill and placed in such an attitude before the court on appeal that he can not have it considered, and this without his fault. This requires a reversal of this judgment if there were no other reasons. We have read the evidence bearing on this question set out in the bill of exceptions and would have no hesitancy under the authorities to reverse the judgment under the rules for change of venue. If upon another trial, appellant moves for a change of venue and the testimony is as embodied in this record, the cause should be transferred to some other county for trial.

Exception was reserved to the failure of the court to charge the law with reference to temporary insanity produced by the recent use of intoxicating liquor. Article 41 of the Penal Code, provides that evidence of temporary insanity produced by recent use of ardent spirits,

may be introduced by the accused in a criminal action in mitigation of the penalty attached to the offense for which he has been tried. "And in cases of murder, for the purpose of determining the degree of murder of which the defendant may be found guilty;" then the statute further requires the judge presiding at the trial when this issue is presented by the testimony, to charge the jury in accordance with the provisions of this article. One of the witnesses in answer to the question as to whether he was drunk or sober, and what was his appearance, stated: "He looked to me like he was drunk. I have frequently heard people say he was drunk but the only way I could tell was by his talk." Q. What did he say? A. He told it in such a broken way that I couldn't understand it.

He further stated that his talk was incoherent; that he would say the appellant was drunk; that he was either drunk or had been knocked down and hadn't recovered or something. And on cross-examination by the State this witness after locating himself and the defendant at the lower end of the bar in the saloon, stated that they stepped back to the door going into the rear room. This seemed to be at the bar where the homicide occurred, and while there he leaned against the bar and was talking or trying to talk to appellant. He was then asked, "now you say that he drank beer and whisky, did he drink anything else in these fifty drinks?" A. He did, he drank wine and vermouth. One of the witnesses was asked, "about how many drinks had he, appellant, taken prior to the time you got down in the evening and noticed it? A. "I should judge about fifty." He also stated that he drank all kinds of drinks, beer, whisky, vermouth, wine and with one of the drinks some absinthe. It seems that during the day, preceding the homicide at night, being pay day at appellant's saloon and bills were being collected, appellant would drink with all the customers who would treat. Again the witness states, "I should judge when I came on, he must have taken fifty drinks or something like that." This character of testimony was gone over and over in the examination and cross-examination but we have tried to condense it.

One of the witnesses was asked if he was positive that appellant could walk after taking the fifty drinks. He answered that he had seen him take more than that and walk. Perhaps it is unnecessary to follow up this line of testimony further for in our judgment it is sufficient to show that the court erred in not charging the statute with reference to the use of intoxicants, and here it may be remarked that the statement of facts covers about 550 pages and is taken down in a stenographic form, questions and answers, and the transcript of the proceedings of the trial contains an additional 480 pages. It will be readily seen that a record containing over a thousand pages in the condition of this one, makes it very difficult for a court to keep in mind and to correctly and properly state the many features of the case.

Error is assigned because the court failed and refused to charge the definition of manslaughter, or submit that issue for the adjudication of

the jury. The court submitted murder in the first and second degrees. Murder in the second degree was defined as the unlawful killing and where it is not murder in the first degree and the evidence does not tend to mitigate, excuse or justify the killing, the law implies malice, and the law does not further define murder in the second degree; "then if the killing is shown to be unlawful and there is nothing in evidence on the one hand, showing express malice, and on the other hand there is nothing in evidence that will reduce the killing below the grade of murder, then the law implies malice and the homicide is murder in the second degree." The facts show that during the day, prior to the homicide at night, appellant was drinking heavily. That passing the saloon of Manning he discovered his wife in the saloon drinking beer. This seems to have outraged his feelings; he became enraged and finally struck her with a pistol; they went home and quarreled for ten or fifteen minutes about the matter, she protesting she had not treated "bums" to beer as charged by him and had not kept Manning waiting to close his saloon; that they returned to the saloon to see Manning, entered the front room, engaged in a conversation with Manning with reference to the matter. When it would seem, for the first time appellant was made aware that deceased and his three companions were sitting around the table in the rear room engaged in card playing, and drinking beer. In talking with Manning, appellant accused his wife of having treated "bums" and kept Manning waiting and one of these parties in the rear room, Censor, denied this rather emphatically; and it angered appellant that Censor should be "butting into his matters" about his wife. Directly deceased denied being treated by Mrs. Miller and making the remarks imputed to him. This led up to the difficulty. Appellant was evidently very much outraged at the time, as well as angered and excited. Immediately the deceased rose from the table, apparently started to the room where appellant and his wife were, then changed direction, passed around the other three parties to the rear of the bar into the room where appellant, his wife and Manning were. They were entire strangers to each other and no cause is shown of antipathy or feeling between the parties prior to the immediate transaction. In his condition of mind and the matters which led up to it and the environments; and his belief that the deceased was getting behind the bar to secure a pistol, in connection with all the other matters, we think the court was required to charge upon the law of manslaughter as an issue in the case. Much of this testimony the court may not have believed to be true. The jury may or may not have believed it to be true, but that isn't the question. Wherever the facts raise an issue favorable to the accused, it is the duty of the court to charge the law applicable to that issue.

The charge on accidental homicide is criticised as being erroneous. This charge was framed under articles 681 and 682 of the Penal Code, which provides that under certain circumstances an accidental killing

will be excusable. We do not believe these statutes apply to the facts of this case. Article 45 of the Penal Code should have been given.

The court gave this charge also: "The testimony of the witnesses to the effect that defendant struck his wife and that the defendant presented his pistol at the witness Meyer and what he said at that time, was admitted for the purpose of showing the state of defendant's mind and for no other purpose, and you must consider it, if at all, for what it is worth, if it is of any worth for that purpose, and no other."

We are unable to understand exactly what this charge means, or was intended to mean. If the court intended to say to the jury that this testimony should be regarded by them alone in regard to the defendant's state of mind towards his wife, or Meyer, then the jury should have been so told. But what has this to do with appellant's case? It singled out these facts and charges on their weight without telling the jury what their worth was in weighing the case for or against appellant in regard to this homicide. These matters occurred sometime prior to his meeting deceased and had no relation whatever to deceased. If as a matter of fact, his mind was excited, angered and outraged by the presence of his wife in the saloon and, as he believed, treating the "bums" and herself drinking in said saloon, it was before he knew of the presence or existence of deceased, therefore could not possibly have had reference to him at the time he struck his wife or pointed his pistol at Meyer. If after deceased became entangled with the difficulty, or brought himself into it by his remarks in regard to appellant's wife treating him as a "bum" and it induced the mind of appellant to believe that the deceased had been connected with his wife, her presence or conduct in there, or was in the saloon together with his companions drinking with his (appellant's) wife, then it might become a powerful factor to enrage his mind beyond cool reflection. This charge was error of a hurtful character. The fact that he had quarreled with his wife and was so enraged that he struck her with a pistol and then pointed it at Meyer, for his supposed interference in a family disturbance, might be a strong indication that his mind was very much excited and disturbed for fifteen or twenty minutes, prior to his meeting deceased, caused by the conduct of his wife. It might be also regarded as a pregnant fact going to show that even if he was not crazed by drink that his mind was fearfully excited. Matters in regard to empaneling the jury are not discussed; they may not occur upon another trial.

Perhaps these are enough of the errors to discuss for a disposition of the case and what has been said will be an indication to the trial court as to the views entertained by this court in regard to the main questions involved in the appeal.

For the errors indicated, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Henderson, Judge, absent.