### T. S. Treadway v. The State.

No. 1280.   Decided February 7, 1912.

Rehearing denied March 6, 1912.

1.—Murder—Change of Venue—Bill of Exceptions—Statement of Facts—Statutes Construed.

Article 621, Code Criminal Procedure, prohibits the order of the judge granting or refusing a change of venue, from being revised on appeal, unless the facts upon which the same was based are presented in a bill of exceptions prepared, signed, approved and filed at the term of court at which the order was made.

2.—Same—Change of Venue—Action of Judge.

Where the judge on his own motion changed the venue of a murder case, and refused to retransfer the case to the original county and required the defendant to announce, and it appeared from the record that he acted within his discretion under article 613, Code Criminal Procedure, there was no reversible error.

3.—Same—Continuance—Want of Diligence—Practice on Appeal. .

Where the application for continuance did not show the necessary diligence in issuing process for the absent witnesses, and it further appeared that most all the witnesses named in the application appeared before the evidence was closed, and that the defendant was able to prove and did prove by other witnesses, in substance, the same matters which he alleged in his

application for continuance, and that other alleged testimony was not probably true, there was no error in overruling the application for continuance and a motion for new trial on this ground.

#### 4.—Same—Statement of Facts—Motion for New Trial.

The statement of facts containing the testimony on a motion for new trial must be filed during the term of court at which it occurred, and can not be filed after the term. Following Probest v. State, 60 Texas Crim. Rep., 608, and other cases.

#### 5.—Same—Continuance—Motion for New Trial—Judgment—Presumption.

It is uniformly held that where there is not a statement of facts on appeal containing the evidence submitted on rehearing over a contest in the motion for new trial, with reference to the refusal of the application for continuance, the Appellate Court will indulge every reasonable presumption in favor of the judgment overruling said motion. Following Mitchell v. State, 36 Texas Crim. Rep., 278, and other cases.

#### 6.—Same—Continuance—Physical Inability of Witness.

Where the application for continuance alleged that one of the absent witnesses was physically unable to attend court, but attached no affidavit or certificate of a physician thereto, but simply stated that he was so informed, there was no error in overruling the application for continuance and the motion for new trial on this ground.

#### 7.—Same—Evidence—Threats—Conversation—Cross-Examination.

Where, upon trial of murder, the court restricted the State, in its cross-examination on the subject of threats by the deceased, to what the deceased said at the time he made the threat and a part of the same conversation, and would not permit the witnesses to go into the details of any claimed charge that the deceased made against the defendant which occasioned the threats, there was no error to permit the State, on cross-examination, to show that the threats by the deceased were based upon the fact that defendant was accused of whipping deceased's daughter, the wife of defendant, the defense claiming other reasons, to show the nature of the threats.

#### 8.—Same—Evidence—Threats—Statutes Construed.

Under article 791, Code Criminal Procedure, providing that where a part of a conversation, etc., is given by one party, the whole may be inquired into by the other, the State may show, where declarations of threats by the deceased were introduced by the defendant, that they were not seriously made, and to show the circumstances under which they were made; besides, these were known to the defendant and properly limited by the court. Following Adams v. State, 47 Texas Crim. Rep., 347.

#### 9.—Same—Evidence—Age of Deceased.

Where, upon trial of murder, testimony had been admitted that deceased was rather an elderly man, there was no error in further admitting testimony that the deceased was fifty-seven years old when he was so killed, as no possible injury could accrue to defendant.

#### 10.—Same—Evidence—Impeaching Witness—Limiting Testimony.

Where, upon trial of murder, the defense introduced a witness to prove a conversation said witness had with the deceased in which the latter stated that he should have killed defendant long ago, etc., there was no error in permitting the State, on cross-examination, to ask said witness if it was not a fact that he had stated to certain parties, naming them, that he did not know anything about the case in which he was summoned, which he denied, and then permitting the State to impeach said witness' testimony by the parties to whom the State claimed he made such statements; and there was no error in the court's failure to limit such impeaching testimony. Following Harrelson v. State. 60 Texas Crim. Rep. 534.

**11.—Charge of Court—Manslaughter.**

Where, upon trial of murder, the evidence showed that the case was either one of murder or self-defense, and showed no passion arising from an adequate cause on part of the defendant, there was no error in the court's failure to submit a charge on manslaughter. Davidson, Presiding Judge, dissenting.

**12.—Same—Manslaughter—Undue Haste—Acts of Deceased—Threats.**

Where, upon appeal from a conviction of murder in the second degree, the appellant, in a supplemental brief, claimed that the evidence in the record would have justified a charge on manslaughter on the theory that when he shot and killed deceased, the jury might have believed that he acted with undue haste against the demonstration of deceased, in the light of threats, which the latter had made, etc; but the evidence did not support such a theory, there was no error in the court's failure to charge on manslaughter upon this ground.

**13.—Same—Charge of Court—Statutes Construed—Rule Stated.**

In the absence of exceptions to the charge of the court, the Appellate Court will not reverse, unless the evidence tending to present a theory favorable to the defendant is so pertinent and favorable that it might reasonably—not possibly—be supposed that the jury could be influenced by it in arriving at their verdict; and there was, therefore, no error in the court's failure to submit a charge on manslaughter on the theory that the defendant acted with undue haste against the demonstration of deceased. Article 723, Code Criminal Procedure.

**14.—Same—Undue Precipitation—Manslaughter.**

It would be a wrong doctrine for this court to say that simply because deceased, at the time he was killed by appellant, was about twenty-eight steps distant from him, that the issue of manslaughter was thereby raised; whereas if he had only been a few yards or feet from him, it would not be raised; as the nearer the deceased was when he made a hostile demonstration, if any, the more apt he would be to arouse in defendant terror or other sudden passion.

**15.—Same—Self-Defense—Charge of Court—Defendant's Standpoint—Threats —Apparent Danger—Actual Attack.**

Where, upon trial of murder, the charge of the court on self-defense properly applied the law of threats, apparent danger and the standpoint of defendant to the evidence in the case, considering said charge as a whole, there was no reversible error on the ground that the court only submitted actual attack and failed to submit the above matters. Following Newcomb v. State, 49 Texas Crim. Rep., 550, and other cases. Distinguishing Poole v. State, 45 Texas Crim. Rep., 348, and other cases.

**16.—Same—Self-Defense—Charge of Court—Statutes Construed.**

Where, upon trial of murder, the court's charge on self-defense, taken as a whole, presented every phase of self-defense as favorable to defendant as the law would authorize or justify, and was not subject to any or either of the objections urged thereto, there was no reversible error under article 723, Code Criminal Procedure.

Appeal from the District Court of Shelby. Tried below before the Hon. James I. Perkins.

Appeal from a conviction of murder in the second degree; penalty, seventeen years imprisonment in the penitentiary.

The opinion states the case.

*V. E. Middlebrook* and *King & King* and *Anderson & Davis,* for

appellant.—On question of charge of venue: Krebs v. State, 8 Texas Crim. App., 1; Preston v. State, 4 Texas Crim. App., 186; Ex parte Cox, 12 Texas Crim. App., 665.

On question of overruling application for continuance: Attaway v. State, 31 Texas Crim. Rep., 475; Lane v. State, 28 S. W. Rep., 202; Roquemore v. State, 54 Texas Crim. Rep., 592, 114 S. W. Rep., 140; Gilcrease v. State, 33 Texas Crim. Rep., 619.

On question of admitting declarations of deceased and motive of deceased in making them: Burnett v. State, 46 Texas Crim. Rep., 116; Fuller v. State, 30 Texas Crim. App., 559; Casner v. State, 43 Texas Crim. Rep., 12; Casey v. State, 50 Texas Crim. Rep., 392; Clay v. State, 44 Texas Crim. App., 129.

On question of undisclosed motive of deceased: Johnson v. State, 22 Texas Crim. App., 206; Adams v. State, 44 Texas Crim. Rep., 64; Tillman v. State, 51 Texas Crim. Rep., 202, 101 S. W. Rep., 210; Gray v. State, 47 Texas Crim. Rep., 375; Darnell v. State, 58 Texas Crim. Rep., 585, 126 S. W. Rep., 1122; Comegys v. State, 62 Texas Crim. Rep., 231, 137 S. W. Rep., 349.

On question of permitting proof of age of deceased: Cole v. State, 48 Texas Crim. Rep., 439; Brownlee v. State, 48 Texas Crim. Rep., 408, 87 S. W. Rep., 1153.

On question of impeaching defendant's witness: Watson v. State, 50 Texas Crim. Rep., 171, 95 S. W. Rep., 115; Taylor v. State, 38 Texas Crim. Rep., 552; Price v. State, 43 S. W. Rep., 96; Collins v. State, 66 S. W. Rep., 840.

Upon question of not limiting impeaching testimony: Coker v. State, 35 Texas Crim. Rep., 57; Paris v. State, id., 82; Shackleford v. State, 27 S. W. Rep., 8; Winfrey v. State, 41 Texas Crim. Rep., 538; Davidson v. State, 27 Texas Crim. App., 262; Maines v. State, 23 Texas Crim. App., 568.

On the question of the court's failure to charge on manslaughter: Arnwine v. State, 49 Texas Crim. Rep., 5, and cases cited in dissenting opinion.

On question of self-defense confining same to actual attack, etc.: Johnson v. State, 60 Texas Crim. Rep., 50, 138 S. W. Rep., 1021; Phipps v. State, 34 Texas Crim. Rep., 560; Graham v. State, 61 S. W. Rep., 714; Brady v. State, 65 S. W. Rep., 521; Watson v. State, 50 Texas Crim. Rep., 171, 95 S. W. Rep., 115; Poole v. State, 45 Texas Crim. Rep., 348; Adams v. State, 44 Texas Crim. Rep., 64.

On question of confining court's charge on self-defense to particular acts: Lockhart v. State, 53 Texas Crim. Rep., 589, 111 S. W. Rep., 1024.

On question that transaction must be viewed from defendant's standpoint: Bell v. State, 20 Texas Crim. App., 445; Spearman v. State, 23 Texas Crim. App., 224; Bonner v. State, 29 Texas Crim. App., 223; Cockran v. State, 28 Texas Crim. App., 422; Brownlee v. State, 48 Texas Crim. Rep., 408, 87 S. W. Rep., 1153.

*C. E. Lane,* Assistant Attorney-General, and *W. B. O'Quinn,* District Attorney, and *Blount & Strong,* for appellant.—Cited cases in opinion on self-defense, manslaughter and change of venue. On question of continuance: If substantially the same testimony as that which is absent was produced on the trial, refusal to grant continuance will not be revised on appeal. Fisher v. State, 4 Texas Crim. App., 181; Walker v. State, 13 Texas Crim. App., 618; Alison v. State, 14 Texas Crim. App., 402; Tucker v. State, 23 Texas Crim. App., 512; Hooper v. State, 29 Texas Crim. App., 614; Bush v. State, 40 Texas Crim. Rep., 539; Fulkerson v. State, 57 Texas Crim. Rep., 80.

The refusal to grant a subsequent application for continuance for testimony merely cumulative will not be revised on appeal. Harvey v. State, 35 Texas Crim. App., 545; Shackleford v. State, 53 S. W. Rep., 884; Grimsinger v. State, 44 Texas Crim. App., 1; Dobbs v. State, 54 Texas Crim. App., 579; Beardon v. State, 47 Texas Crim. App., 271.

And the further rule is, regardless of whether the testimony is cumulative or not: That a case will not be reversed for a refusal of a continuance unless it appears reasonably probable that if the absent testimony had been before the jury a verdict more favorable to defendant would have resulted. Frizzell v. State, 30 Texas Crim. App., 42; Ellis v. State, 30 Texas Crim. App., 601; Goldsmith v. State, 32 Texas Crim. Rep., 112; Gallagher v. State, 34 Texas Crim. Rep., 306; Land v. State, 34 Texas Crim. Rep., 330; Coffman v. State, 56 Texas Crim. Rep., 75; Sweeny v. State, 59 Texas Crim. Rep., 370, 128 S. W. Rep., 390; Lane v. State, 59 Texas Crim. Rep., 595, 129 S. W. Rep., 353; Covey v. State, 23 Texas Crim. App., 388; Hyden v. State, 31 Texas Crim. Rep., 401; Logan v. State, 39 Texas Crim. Rep., 573; Cordway v. State, 25 Texas Crim. App., 403; Hammond v. State, 28 Texas Crim. App., 413; Tweedle v. State, 29 Texas Crim. App., 586; Frizzell v. State, 30 Texas Crim. App., 42; Goldsmith v. State, 32 Texas Crim. Rep., 117; Browning v. State, 26 Texas Crim. App., 432; Lafferty v. State, 24 S. W. Rep., 507.

PRENDERGAST, Judge.—On September 15, 1910, the grand jury of Nacogdoches County indicted the appellant for the murder of Eli Box on May 2, 1910.

Some time in October, 1910, he was tried in the District Court of Nacogdoches County, or rather there was a mistrial, because the jury failed to agree, and were properly discharged by the court on that account.

Prior to said mistrial the appellant made a motion to change the venue, which was contested by the State and the evidence heard thereon by the judge, who denied the appellant's motion.

The record in this case shows that it (the record) was applied for by the appellant's attorneys on March 11, 1911. The trial from

which this appeal was taken began on March 2, 1911, and continued until at least some time on March 7, 1911. The record proper, and original statement of facts, was filed in this court on May 24, 1911.

There appears with the record a certified copy of what purports to be a statement of facts heard by the judge below on appellant's motion for change of venue. It seems to have been applied for by appellant's attorneys on June 1, 1911, and was not filed in this court until June 14, 1911. It is separate from and not a part of the record proper in the case. There is no bill of exceptions anywhere in the record, containing this purported statement of facts. Article 621, Code Criminal Procedure, prohibits the order of the judge granting or refusing a change of venue from being revised on appeal, unless the facts upon which the same was based are presented in a bill of exceptions prepared, signed, approved and filed at the term of court at which the order was made. It is needless to cite the cases decided by this court under the said article, but they all conform thereto. Therefore, the manner in which this matter is presented, it can not be considered by us, nor can we consider, for any purpose, the purported statement of facts filed herein on that subject.

Besides what is stated above, it appears from the record that on October 19, 1910, the judge of the District Court of Nacogdoches County, on his own motion, as he clearly had the right to do under article 613, Code Criminal Procedure, changed the venue from Nacogdoches to Shelby County, which was one of the counties within his district, and recited fully in his order the grounds, which were amply sufficient, for such change of venue. This order is full and complete and shows that the appellant was personally present, as was his counsel and the district attorney, and no exception or objection appears therein. However, there is a bill of exceptions in the record now which shows that at the time the court entered the order changing the venue, appellant objected to the court's order changing the venue from Nacogdoches to Shelby County at the time it was made, because, in substance, the county seat of Shelby County was further from the county seat of Nacogdoches County than some of the other adjoining counties in the same judicial district, and that Center, the county seat of Shelby County, was inaccessible and inconvenient to reach because of the railroad. facilities and train schedules; and that the same prejudice against appellant existed in Shelby County that had existed in Nacogodoches County, caused by the publicity of the charges against appellant and the trial of this cause in Nacogdoches County and also because appellant had once before been tried in Shelby County on account of proceedings in a divorce suit of his therein, and that some of the witnesses therein had been indicted and convicted of perjury and he, himself, had been indicted and tried for subornation of perjury in the same case; and that these objections did not obtain in some of the other adjoining counties to Nacogdoches. The court, in allowing this bill, qualified it by stating

that he did not approve as correct the appellant's statements therein
as to the schedules upon which trains are run and the various con-
nections of the trains and the distances between points as set out
therein, and he stated that it was not known that the same schedules
would be in effect when the case would be called for trial in Shelby
County. And "it was shown that the divorce suit and prosecution
of defendant's witnesses for perjury occurred some fourteen years
ago, and that if there was an indictment of defendant growing out
of the transaction it was dismissed many years ago, and it was shown
to the satisfaction of the court that the attention the divorce suit,
and its incidents attracted, was local to the neighborhood where the
parties then lived and that from lapse of time this had been mostly,
if not wholly, forgotten."

By another bill in this connection it was shown that when the case
was called for trial at this time when it was tried, the appellant ob-
jected to announcing therein because the court had erroneously
changed the venue from Nacogdoches to Shelby County, and re-
quested that the case be transferred back from Shelby to Nacogdoches
for the reasons shown by defendant's bill of exceptions above noted.
That the court refused this and required appellant to announce, to
which he excepted. In allowing this bill, the court qualified it by
stating "that no motion or affidavit was made to change the venue.
A mere verbal suggestion by counsel for defendant."

The way this matter is presented no reversible error whatever is
shown by the court of his own motion changing the venue from
Nacogdoches to Shelby County, as he did; nor by refusing to re-
transfer the case from Shelby to Nacogdoches County, nor in requir-
ing the appellant to announce under the circumstances.

When the case was called for trial appellant made a motion to
continue it, which was his second application to continue, on account
of the absence of ten witnesses, naming them, and giving their resi-
dences. In his motion he states the diligence used by him to pro-
cure their attendance and states that he exhibits to the court each
and all of the process hereinabove referred to by him in his applica-
tion, for its inspection and as a part of his motion for continuance.
This process nowhere appears in the record.

The motion shows the testimony the appellant expected to prove
by each of said witnesses. Briefly, what he expected to prove by
Mayfield, Long and Escabar was, that they were his section hands
and were present when the killing occurred. That deceased was ap-
proaching him while he was sitting on the handcar with his back
to deceased, and that deceased had his hand in his bosom; that appel-
lant called to him and told him to stop and not come up to him;
that he then got his gun and again demanded of deceased to stop,
saying if he did not he would have to shoot him, and then instantly
fired; that they saw no change in deceased's position when appellant
was requesting him to stop; that they could see deceased only from

his waist up; that they know appellant distinctly called deceased to stop twice before appellant got his gun and once after he got it. The court overruled the motion. Neither the application nor the record elsewhere shows that the appellant thereafter applied for or had issued any other process to procure the attendance of any of said witnesses. As stated above, the case was called for trial on March 2, 1911. The trial continued from that time until some time during March 7, 1911.

In allowing the bill to the overruling of this motion the court qualified it by stating "that most all witnesses named appeared before evidence was closed and, as explained by the evidence and proceedings, on motion for new trial and contest of same by State. See record of same."

There appears with the papers in this cause a separate document which appears to be an original statement of facts which was heard by the court below on hearing the appellant's motion for new trial. It was prepared by the court stenographer and certified to by him on April 11, 1911, and agreed to by the court and all the parties thereto. It was filed in the court below on May 15, 1911. That term of court, as shown by the record, adjourned on March 14, 1911. It has been uniformly held by this court that such a statement of facts must be filed during the term of the court at which the trial occurred, and that the statutes permitting the statement of facts on the main trial to be filed after term time did not apply to such satement of facts on the hearing of the motion for new trial. Probest v. State, 60 Texas Crim. Rep., 608, and cases therein cited. So that this court can not and does not consider the said purported statement of facts on the motion for new trial.

In this connection the record shows that the overruling of the said motion for a continuance was made one of the grounds of the motion for new trial, and that said motion for new trial was contested by the State, and particularly on this point. Among other grounds urged by the State in said contest was that the appellant was able to prove and did prove by other witnesses, in substance, the same matters which he alleged he could prove in said motion for a continuance by the witnesses, Ford Parmelly, Pink Grayson and Mrs. Pink Grayson, and because the witnesses, Ed. Long and Joe Escabar, who were alleged to have been present at the time of the killing would not have testified to the facts set up in said motion for continuance, but if they had been present and if they had so testified said testimony was not probably true, and the State attached as an exhibit to and a part of, said contest the affidavit of said Long, which was made on May 4, 1910, fully detailing what his testimony would be and shows that his testimony would have been entirely different from what was claimed by appellant in his motion for a continuance. The State also in said contest and as a part thereof, in addition to attaching the affidavit of said Long, also attached the affidavit of

John McCuistian and John Mayfield, made May 4, 1910, for the purpose of showing that the facts which defendant alleged that he could have proved by the witnesses Long and Escabar were not probably true and would not have been testified to by said witnesses had they been present. The affidavit of said Mayfield is as follows:

"I, John Mayfield, make this as a voluntary and true statement of the facts as I know them in reference to the killing of Eli Box by T. S. Treadway on the 2d day of May, A. D. 1910. On the morning of the killing the section gang, composed of myself, John McCuistian, Edward Long, three Mexicans and T. S. Treadway, met at the section house and left same about seven o'clock on a handcar to go to a portion of the track near Eli Box's farm; Treadway claiming to have orders to do some work at that point. We arrived at that point, that is, near Box's farm, and had been at work about an hour when I first saw Mr. Box; he came riding horseback down through his field, and got off of the horse and went down to where his little boy was hoeing and staid there some little bit, and then left, and the next time I saw him, he and his three little boys came back up in the corn patch, situated near the right of way, two of the little boys had their horses and ploughs, and the other little boy had a hoe. Treadway during all of this time was sitting on the end of the handcar, which was on the track, and was situated so he could see Mr. Box. While Treadway was sitting on the end of the handcar, and after Mr. Box and his little boys had come into the corn patch, as above stated, I heard Treadway say in a low tone of voice: 'Don't come any further,' and supposed at the time he was talking to we section hands who were at work, as Mr. Box could not have heard the remark. At that time I saw Mr. Box, and he was standing up in the cornfield some thirty yards, with his right side to the railroad track and to Treadway, apparently looking after the little boys at work. Soon after Treadway made this remark, he got off of the handcar and went to where his gun was, which he had leaned up by the side of an embankment when we first got there, and picked up the gun and walked down by the side of the embankment some eight or ten steps and threw up his gun and shot Mr. Box, stating at the time: 'I will kill you.' At that time, that is, when the shot was fired, I saw Mr. Box, and he was in the same position as above described, that is, with his right side towards the track and towards Treadway, and doing absolutely nothing; and at the time the shot was fired, Mr. Box seemed to be looking the hands at work, with his head turned in that direction, and was not looking at Treadway. Mr. Box at the time the shot was fired was standing perfectly still and making no movement with his hands that I could see, and not looking at Treadway, and was some thirty yards away from where Treadway was. Mr. Box was in his shirt sleeves at the time. Immediately after Treadway fired the shot he walked back to where we were at work and gave two Mexicans some instructions with ref-

erence to the fixing of the track and told me, McCuistian, Long and a Mexican by the name of Joe Escabar to get on the handcar and bring him to town. While we were on the way to town he made the remark he 'had killed the damn son-of-a-bitch,' and told us he wanted us to swear that Mr. Box was coming towards him with his hand in his bosom, and asked the Mexican if he, the Mexican, understood what he, the Mexican, was to swear, and the Mexican told him 'No,' and Treadway then told the Mexican that he must swear that Box was coming on him, Treadway, with his hand in his bosom. Me and Long made no reply to Treadway when he told us what he wanted us to swear, but McCuistian told him that he was going to tell the truth. From where Treadway's gun was sitting by the embankment, Treadway could not see Box, and he had to walk down by the side of the embankment some eight or ten steps to about the point from which he fired the shot in order to see Mr. Box. Treadway asked us after we got on the handcar and while we were on the way to town, if we heard him say: 'Stop,' or 'Don't come any farther?' Treadway remarked on one occasion before the killing, in the presence of me and possibly the other members of the section gang, that if he did kill Box he would have some damn good witnesses, and I heard him say on different occasions prior to the killing that if old man Box fooled with him he would kill him. Treadway carried his gun from the section house on the handcar with him on the morning of the killing. I do not think that Mr. Box saw Treadway at the time he shot him, or had the least intimation or warning that Treadway was going to kill him. Treadway seemed perfectly cool and was not excited, so far as I could see, either before, at the time, or after the shooting. Mr. Box had no weapon of any kind that I saw, and had done nothing to indicate that he intended to do Treadway or anybody else any harm, but was apparently engaged in looking after his little boys in their work." The said affidavits of Long and McCuistian were substantially the same as Mayfield's.

The State further alleged in said contest, and offered to prove upon the hearing of the motion, that three of the six parties—McCuistian, John Mayfield and Jesse Garza, shown to have been present at the time of the killing—were present in court upon the trial of this cause when tried in Nacogdoches County and that the witnesses Long and Escabar were both present at that trial and that the appellant did not then use either of them, nor any of the other parties shown by him to have been present at the killing. And further that the appellant, in his motion to continue, alleged under oath that he could prove the same facts by the witness Mayfield that he could prove by the witnesses Long and Escabar and that the State would show and offer to prove upon the hearing of said motion for new trial that said Mayfield was in attendance on this court, having arrived after the presentation of said motion for a continuance and

before the jury was completed, and remained in attendance through the trial, and that appellant did not offer him as a witness in appellant's behalf, thereby showing that the allegations in his motion as to what he could prove by said witnesses were untrue.

The judgment of the court overruling the motion for new trial shows that the court heard the evidence submitted on the hearing thereof and overruled the motion. As stated above the purported statement of facts on said hearing, not being in the record, and not having been prepared and filed during term time, can not be considered for any purpose. (Black v. State, 53 S. W. Rep., 116.) It is uniformly held by this court, that where there is not a statement of facts on an appeal, that this court will indulge every reasonable presumption, that the action of the lower court was sustained by the evidence. This likewise applies on such a motion as this. This court, through Judge Hurt, in Mitchell v. State, 36 Texas Crim. Rep., 278, in discussing the diligence used to procure witnesses and the presumption arising therefrom, among other things, said: "If the process had been returned several days before the case was called, and the witnesses were absent, it was the duty of appellant to have obtained attachments for said witnesses; and when the case was called for trial, it was three or four days before the evidence closed in the case, and yet no effort is shown in the application to obtain the attendance of said witnesses. We reasonably presume that, if they lived in the county, their attendance could have been secured by any reasonable effort on the part of appellant before the close of the testimony." And in further discussion of the same questions, on page 300, the court further said: "Moreover, we would remark as to the Harris County witnesses, that one of them, to wit, Chancery, by whom, according to the application of appellant, more testimony of a more material character for appellant could be elicited than by either of the other witnesses—that before the beginning of the argument in the case said witness was produced and brought into court, and no effort was made on the part of the appellant to avail himself of his testimony. If appellant failed to avail himself of the best witness he had, according to his affidavit, when it was within his power to produce them before the jury, we can not reasonably presume that he would have used the other witnesses had they been present."

Then again, on motion for rehearing, in discussing the same questions, the court in the same case on page 307, said: "It will be further observed that, although the trial in this case lasted four or five days, no effort was made to procure the attendance of any of the absent witnesses after the trial began. For aught that appears, by the use of reasonable diligence they could have been obtained in time to have testified in the case. Counsel, however, insist that on the overruling of his motion for a continuance he was not able to do any more in the way of diligence, and, no matter if said wit-

nesses were accessible, and could have been produced, that upon the overruling of his motion for a continuance the case was, as to that matter, in statu quo, and this court could not look beyond the time of the overruling of the application for a continuance, as to the question of diligence. The statute places it in the discretion of the court to overrule a motion for a continuance, and then to reexamine the question on motion for a new trial, and to refuse a new trial, unless it should appear that the absent testimony was material, and probably true. And we hold that it is perfectly competent for the court to look to the action of the appellant and his counsel after the overruling of a motion for continuance, in passing upon the materiality or probable truth of the absent testimony. Suppose, in a trial of this character, counsel were informed by the court that the witness was in town, and could be had, and counsel should decline to ask for process to bring the witness before the court, or suppose that afterwards (as in the case of the witness Chancery) he should actually come into court, and appellant should decline to use him, would not the court be compelled to hold in such case that appellant was trifling with the court, that the witness would not swear what was alleged, or else appellant did not regard the testimony as probably true? Such occurs to us to be the inevitable conclusion. And thus, considering the action of the appellant with reference to these witnesses, we would hesitate to accord a new hearing upon this ground."

Again, it was held by this court, through Judge Henderson, in Blain v. State, 34 Texas Crim. Rep., 448, that where a number of witnesses have been summoned as to an issue and are not placed upon the stand, the appellant can not claim a continuance on account of the absence of other witnesses upon the same point, the court saying: "The defendant should have exhausted the testimony presented before he could claim a continuance on account of the absence of other witnesses upon the same point."

Again, Judge Willson, for this court, in Allison v. State, 14 Texas Crim. App., 402, said: "All the material facts which defendant alleged he expected to prove by the witnesses (naming them) were sufficiently proved by the testimony of other witnesses who testified on the trial and defendant was, therefore, not injured by the absence of those witnesses."

It is true as to the witnesses Mr. and Mrs. Grayson, defendant in his application, says: "This defendant is informed that the said Pink Grayson is now suffering from a mashed and broken foot recently received by him and that he is at this time physically unable to attend this court and that his wife, Mrs. Grayson, is now in constant care of her said husband because of said injuries and is unable to at this time leave her said husband in his crippled condition," yet he does not inform the court by his application anywhere, the source of his information, nor the reliability thereof. If the

witness Grayson was in such condition, it would have been easy for the appellant to have procured his affidavit to that effect or a doctor's certificate, or affidavit to that effect, or the information from some reliable and authentic source. Merely stating that he is "informed," etc., in view of the whole record in this case, was not sufficient and did not require the court to either grant the continuance on that account, or require him to grant a new trial on that account. Further, in view of the fact of the allegations by the State in its contest of the motion for new trial, and the evidence heard thereon, we must assume that the action of the court in overruling the motion for a continuance and for a new trial on that account was correct, and fully sustained by the evidence.

Several of appellant's bills complain of the action of the court in permitting the several witnesses who testified to threats made by the deceased against the appellant to kill him, and that he ought to kill him, and that he should not work the right of way of the railroad which ran through the deceased's farm, which threats were shown to have been made by the deceased, beginning more than two years before the killing of deceased by appellant, and made continuously from time to time from that time up to within a short time of the killing, some of which threats were shown to have been communicated to appellant soon after they were made and from time to time for the two years before the killing; and in permitting the State, on cross-examination, to bring out from said witness and as a part of the same conversation the circumstances under which the threats were made and the cause stated by deceased therefor at the time. The record shows that the court restricted the State in its proof on this subject to what the deceased said at the time he made the threats, and as a part of the same conversation, and would not permit the witness to go into the detail of any claimed charge that the deceased made against the appellant which occasioned the threats. As an illustration, bill No. 8 shows that after the State's witness, Avery Box, son of the deceased, had testified for the State, on cross-examination by appellant, he stated that he had heard his father, the deceased, say several times that the defendant could not work that portion of his section upon the railroad which passed through his, deceased's, field, and that he heard him make such statement the last time about one month prior to the homicide, the State was then permitted to prove by said witness that said statements were made by the deceased about the time that defendant was accused of whipping deceased's daughter, the then wife of defendant, which testimony was offered by the State for the purpose of showing the cause and reason of the statements—threats—made by the deceased. The appellant objected to this testimony by the State for the reason that it was immaterial and irrelevant as to why deceased had made said statements, the purposes and motives of the deceased not being a proper inquiry, but the motive of appellant being the sole subject of investigation. The

court in allowing these bills substantially explained and ·qualified them by stating: "This and similar evidence complained of in other bills was explanatory of the nature and circumstances of the threats, and did, when made, have their relation to the homicide."

Article 791, Code Criminal Procedure, is: "When part of an act, declaration or conversation or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other, as when a letter is read all other letters on the same subject between the same parties may be given. And when a detailed act, declaration, conversation or writing is given in evidence, any other act, declaration or writing which is necessary to make it fully understood, or to explain the same may also be given in evidence."

Again, our statute on the subject of threats indicates that proof may be made that the person making them might reasonably be expected to execute them. In other words, when a threat is proven it is important to know whether it was a mere idle threat without cause or without supposed cause, or whether it was seriously made and whether the party making the threat was of such a character as would probably execute it. Otherwise, the jury would not be in a position to properly weigh and consider the threat, but they could do so when the occasion for it, the cause of it and the circumstances under which it was made, was given to them.

This question on both of these phases, that is, whether threats are seriously made and the circumstances under which they were made, and that the balance of the conversation, when one party has proved part of it, may be drawn out by the other, has been directly passed upon by this court through Judge Davidson, in ·Adams v. ·State, 47 Texas Crim. Rep., 347. He said: "Appellant was permitted to prove that threat. The nature of the threat and the inducing cause for the threat were legitimate facts to go to the jury. Its tendency was to throw light upon the transaction and explain the reasons for the threat. Under our statute, whenever part of a conversation is introduced, the entire conversation is admissible, if it tends to explain or make clear the purport of the conversation. Deceased stated he had made the statements about Bryan's wife, and that they were true, and that he intended to kill defendant because he had repeated his statements. It is not legitimate to take out a portion of ·the inducements for .the threat; it should all go to the jury in order that they may be able to weigh the force of the threat, and its probable seriousness."

The court did not err in permitting the State to make this proof as complained of by appellant's several bills of exceptions on that subject.

There is nothing in appellant's contention that the reason for the said threats made by deceased against him from time to time were unknown or undisclosed to appellant, because the record teems with evidence that the appellant not only was informed by various per-

sons who communicated deceased's threats to him, but he had absolute knowledge all this time, and from at least in the early spring of 1908, that deceased's hostility and animosity against him, which caused him to make the said threats against appellant, were on account of the deceased's claimed mistreatment by appellant of the deceased's daughter by whipping her, producing an abortion upon her and causing her to write a letter derogatory to her, she being the wife of the appellant during all this time.  On this question the record shows that the court gave a proper charge limiting all this testimony within its proper bounds.  There seems to be no complaint of the charge of the court on this subject.  The proof also, without contradiction, shows that the deceased had the right to be where he was at the time he was killed.  He was in his own field where he was accustomed to be and where the appellant had seen him many times during the previous two years superintending and directing the work in his own field.  That the railroad and its right of way ran through the deceased's farm.  In other words, the deceased's farm was on both sides of the railroad track and right of way.  The appellant is shown to have known all this at the time and long before the killing.

Appellant's next complaint is that the court erred in permitting the State, over his objections, to prove by Mrs. Box, wife of deceased, that he was fifty-seven years old when he was killed.  This was objected to by appellant on the grounds that it was immaterial and irrelevant, and that, as it was shown that defendant was only forty-six years old, the testimony as to deceased's age was calculated to lead the jury to believe that he was old, feeble and helpless, and that appellant was young, stout and robust, and to give greater weight to the State's theory because of the deceased's age and refuse to consider the facts fairly and impartially between the appellant and the deceased, because of their respective ages.

The record shows that the appellant proved his age on the trial of the case, and that each party, the State and the appellant, on the trial of the case, had most, if not all, of the witnesses to testify to their respective ages, the testimony in this regard showing that they were from young boys to quite old men.  This is always done on the trial of most every case, civil and criminal.  In addition to this, the record shows that it was proven time and again, by both the State's and the appellant's witnesses that the deceased had grown married children, who had families of their own at the time he was killed.  It further shows that the appellant married a daughter of the deceased prior to 1908—how long prior thereto is not shown, but the evidence tends to show that it was some time prior thereto.  All of this without any objection whatever by the appellant.  All of this testimony would show that the deceased was rather an elderly man.  There was no possible injury to accrue to the appellant by permitting the State to then prove by the wife of the deceased that deceased

was fifty-seven years old at the time he was killed. We think that the objections of the appellant to this testimony were hypercritical, or at least that the evidence could, at most, have but improbable and remote effect in the case and none of it, in our opinion, materially against the appellant.

Appellant also complains that the court erred in permitting the State to impeach the testimony of the appellant's witness, Stone, and if not error as to the admission of this impeaching testimony, then it was error in the court not to give a charge limiting the impeaching testimony for that purpose alone.

The facts about this matter are these: The appellant introduced the witness Stone, who, in substance, testified that he was constable of the precinct in Nacogdoches County, embracing the town of Nacogdoches, in 1910, he then filling his second consecutive term as constable; that he knew the deceased all of his life, he then being forty-three years old; that some two or three weeks before the killing of Box by appellant he had a conversation with Box, the deceased, in the town of Nacogdoches, fixing the place, and in that conversation he was talking about the case against appellant for whipping his wife having been reversed by the court and said to him there was not any use for him to try to get justice out of the courts, for he could not do it; that if he had done what he ought to have done he would have taken his gun and killed appellant at the start, and he would have to do it yet if he got justice, and said, "There is no use in me carrying my gun. I will have to resort to other means," stating as a reason that there was no use in carrying his gun, that every time appellant saw him with his gun he run. This witness Stone further testified that he saw appellant that same evening and told him the very identical words that deceased had said to him, detailed above.

On cross-examination the court permitted the State to ask the said witness Stone, in substance, if it was not a fact that he had stated to R. I. Taylor and C. B. Linthicum, on the day he was subpoenaed as a witness in this case by appellant, at the trial at Nacogdoches in October, 1910, that he did not know what he wanted with him, as he did not know anything about the case. Appellant objected to these questions and to requiring his witness Stone to answer them, because it was immaterial and inadmissible, was an attempt to lay a predicate to impeach the witness upon an immaterial matter or issue, contradicting the witness upon a statement or expression of his opinion and conclusion, and even though the witness had made such statement, the same was but the expression of his opinion and conclusion as to whether or not he knew of any facts material to the issues to be tried, and was an attempt to lay a predicate to impeach him by an expression of his opinion and conclusion as to whether or not he knew any material facts in the case. The court overruled these objections and required the witness Stone to answer them. In

approving the bill on that subject he qualified it "as shown by the statement of the facts."

Appellant also objected to the State asking said witness Stone on cross-examination if he did not state to Henry Milliard on the day the deceased was killed and after hearing it, and while they were on their way from Nacogdoches to where the killing occurred, that he was surprised, as he thought the matter had been entirely dropped, as he had not heard either the defendant or deceased mention the trouble for several months. Substantially the same objections were made to this as to the previous questions above stated. The court overruled the objections and required the witness to answer. In substance, he denied making the statements above imputed to him.

The court, thereupon, permitted the State to introduce the witnesses Taylor, Linthicum and Milliard, who flatly contradicted the appellant's witness Stone on that subject, to which appellant objected, as the said several witnesses testified, on substantially the same grounds as stated above. The court overruled the objections and permitted each of the witnesses to so testify.

The court gave no charge to the jury limiting the effect of this impeaching testimony. The appellant requested no charge on the subject.

In our opinion the questions asked appellant's witness Stone did not call for, nor did he in answer thereto, merely express his opinion or conclusion. On the contrary, what he was asked called for a statement of fact by him and was not his opinion or conclusion. The testimony of the State's witnesses, impeaching him, was material and clearly admissible for that purpose.

We deem it unnecessary to cite the authorities to show that contradictory statements may be introduced by either party to contradict the witness of the other where material and pertinent, because such is the unquestioned rule; but see Branch's Criminal Law of Texas, sec. 871.

It is also the unquestioned rule that if impeaching testimony can only be used by the jury to impeach a witness, it is not necessary to charge on the subject at all. Or, in other words, that it is only necessary for the court to charge limiting such testimony where the same could be used by the jury to establish any fact in the case other than as affecting the credibility of the impeached witness. See the cases collated in Branch's Texas Criminal Law, sec. 873, page 555, last paragraph; Harrelson v. State, 60 Texas Crim. Rep., 534, 132 S. W. Rep., 787.

In our opinion the impeaching testimony of the witness Stone was material and pertinent and the questions asked and answered by him were neither conclusions nor opinions, but were facts; and the testimony of the impeaching witnesses could not be used by the jury for any other purpose than the impeachment of the witness Stone. So that the court did not err in these matters complained of.

Appellant also complains that the court committed reversible error in not charging the jury on manslaughter. He requested no charge on the subject. He simply complains that the court did not charge thereon and he excepted at the time to the charge of the court because thereof.

We deem it unnecessary to give a detailed statement of the evidence in this case. We will merely mention the salient points which are proper to show the issues that were raised by the evidence and which required a proper charge thereon from the court.

Some time prior to 1908—the exact time is not given, though from the record we conclude it was several years prior thereto—the appellant married the daughter of the deceased. It is not definitely stated in the record when the trouble arose between the appellant and his wife, which came to the knowledge of the deceased, but it also must have been some time prior to 1908. In any event, the record shows, without controversy, that the deceased was informed, believed and acted upon what he understood was the treatment by appellant of his wife, deceased's daughter, in these particulars: That the appellant had whipped his wife; that he had forced her to write some letter reflecting upon herself, and that he had produced, or attempted to produce, an abortion upon her. Thereupon, as early as in the early part of the spring of 1908, more than two years before the killing, the deceased began to make threats against the appellant which were to the effect that he ought to kill him; that he could get no redress from the courts and that he ought to have taken the matter in his own hands to get justice; that the appellant should not work the right of way of the railroad, of which he was section boss, through his, deceased's, farm. Deceased had prosecuted appellant for whipping his wife, and he was convicted, but on appeal about April, 1910, this conviction was reversed. This greatly enraged deceased, and appellant was informed shortly before the killing that deceased renewed his said threats, and that he would have to take it in his own hands, that he ought to have killed appellant at the start and intended to do so yet, that it was no use to carry his gun, he would have to resort to other means. Other phases of threats may have been made, but the substance of those given above are sufficient to illustrate the questions in this case. These threats were made by the deceased, beginning in the early spring of 1908 and continued from time to time and repeatedly thereafter up to within a very short time of the killing. Most, if not all, of these threats were communicated by the parties to whom they were made, or others to the appellant soon after they were made. There is no question but that the appellant knew of them all the time from the early spring of 1908.

The deceased owned his farm which is called his section in the testimony. We take this to mean that probably his farm contained

as much as a section of land, 640 acres. The right of way of the
railroad company ran through the deceased's section of land. The
deceased's residence was on the east side of the railroad. His farm
was on both sides, the east and the west. The railroad track, where
it ran through deceased's farm, made a cut which, together with the
earth taken out of the railroad track and thrown up on the sides,
made a considerable embankment. The shot was fired by appellant
while he was standing at the railroad track in this cut. As the
embankment was right at the appellant from where he shot he could
see, as he · testified, almost the whole of the body of the deceased,
at the time he shot him, from his knees up. From a description of
this embankment by various witnesses, it is evident that the deceased
could not have seen the body of appellant at the time, or prior to
the shooting, but that at most, he could only have seen a portion of
his head or shoulders.

Prior to the time of the trouble between appellant and the de-
ceased, the deceased had not carried with him around over his farm
a shotgun. After the trouble between them and deceased began to
make said threats against appellant, deceased is shown to have gen-
erally carried his gun with him. According to the appellant's tes-
timony and that of some of his witnesses, the deceased, on two or
three occasions, perhaps several occasions, some considerable time
before the killing, had made maneuvers in going about the right of
way of the railroad where the appellant was working, showing or
tending to show that he was seeking to execute his threats on appel-
lant. On some of these occasions when deceased would make these
demonstrations, the appellant would get behind the embankments so
as to be out of sight of the deceased. At other times he would walk
up among his section men so as to keep some of them between him
and the deceased, and on at least one other occasion, when some
visitor to him was present, he kept the visitor between him and the
deceased. On all of these occasions the appellant apprehended that
the deceased was seeking an opportunity to execute his threats as
he believed.

Notwithstanding all this, the appellant is shown, without · ques-
tion, to have been the railroad section boss on the line of the rail-
road, which included the part of it that run through deceased's field,
the whole of this time and passed back and forth over it almost daily,
sometimes several times a day, and is shown to have worked it, and
had it worked during all these two years. That on the occasion of
the killing the appellant had received positive instructions from his
superior to work that part of the track running through deceased's
field, which was a part of the track in appellant's section.

On the morning of the killing the deceased had gone from his resi-
dence east of the railroad across the railroad to the west part of his
farm, riding horseback in his shirt sleeves, without a gun, and it was
shown beyond question that he had no weapons of any character on

that occasion. When the deceased first appeared upon the scene horseback he was seen by the appellant. According to appellant's own statement, he rode going in one direction in about 150 yards of appellant. He is then shown to have gone some distance west beyond the railroad to where his three boys were at work plowing in his field. Where the three boys then were was out of sight of the appellant. After riding past appellant, first to one portion of his field, he rode back in the same general route and within about the same distance of the appellant, and appellant then saw him going to another part of his field west of the railroad. On this occasion deceased directed two of his boys to go over in his field near the right of way of the railroad to plow some young corn he had, and which they did. He then turned his horse in a grain patch and walked back from the western portion of his field towards the railroad track, where these two boys had just commenced plowing his young corn.

We will now copy the whole of the testimony of the appellant as to what he said occurred at the time and just prior to the killing. On direct examination he testified: "And then, on Monday, I went to fix this track in Mr. Box's field, on Monday morning the first thing I went to Mr. Box's field to fix this place; I left the section house about seven o'clock that morning to go and fix that track; the section house was nearly two miles from that point; John McCuistian, John Mayfield and Ed. Long, and three Mexicans composed my section gang at that time; they were all men. I carried a shotgun with me that morning; I carried that gun with me to defend myself if I had to. When I got down there, there was not anybody working in Mr. Box's field, Mr. Box was not working in sight, and I went to work and had the track very near completed, and just before it was completed I saw Mr. Box ride around the field and he rode down through the field and then went back east and went out of sight; well, I thought Mr. Box was gone and didn't think anything more about him, though he had rode around about 150 yards from where I was at and rode around going back the other way; the section gang were there with me at work at that time and I was there on the track. When Mr. Box passed out of my sight I reckon he was gone something like—well, I will say thirty-five or forty minutes, and the next time I saw him he was coming back behind me; I was sitting on the end of the handcar at that particular time, on the north end of the handcar—it is called east and west by our time card—and I was sitting on the west end, the track ran northwest and southwest; I was sitting on the end of the handcar about the center of the track; I was facing north; the men were scattered all along the track there; when I first discovered Mr. Box coming, some of the men, I couldn't tell which one it was now, but someone there says, 'Mr. Tom, yonder comes Mr. Box now,' and I just looked back over my shoulder and saw him coming; he was coming up kinder—

well, not hardly behind me, but nearly behind me, coming up these rows here (indicates on plat). When I first saw Mr. Box coming I suppose he must have been something like seventy-five yards from me. As to what occurred from that time on after I seen him, I got up and stood up there by the side of the car and I halloed to Mr. Box. I says, 'Mr. Box, please don't come up here with your hand in your bosom that way,' and I says, 'Please stop.' I said that because he was coming just right straight towards me with his hand in his bosom, with his right hand in his bosom; I didn't have my gun at that time, my gun was lying right down opposite the front of the handcar on the bank, opposite the north end of the handcar, where I was sitting; and Mr. Box made no stop and the second time I says, 'Mr. Box, for God Almighty's sake, stop; don't come upon me in any shape like that; don't come.' And he just kept coming along at me as hard as he could, and I got up and just reached over and got my gun and I says, 'Mr. Box, stop; don't come any further,' and he never made no halt, just come right on right towards me, and I told him the last time, 'If you come any further I will be bound to shoot you,' and then he made his bulge to turn himself, you know, to pull out a gun or something, he had something black; with reference to the way his face and body were, like that man sitting there, he was coming; of course, the wire fence was between me and him, and he was coming sorter ante-godling across the rows, the rows were running like the fence, and when I told him, 'If you come any further I will be bound to shoot you,' and just as he did that he fell back, you know, that way (indicates) and I shot him; his face was over his right shoulder when I shot him and his right hand in his left bosom; I shot at that particular time; he was trying to get something out of his bosom with his right hand at that time; I shot one time; I shot because I thought he was fixing to shoot me, and I had got the word he was aiming to kill me and was coming on me with some other means. I had seen Mr. Lawson the day before this shooting, and I had seen Mr. Stone about two weeks before that. When I shot Mr. Box he had hold of something black with his right hand, I couldn't tell what it was; I thought it was a pistol. I was standing right at the north end of the handcar when I shot; when I shot I just went back and layed my gun down on the handcar and told the boys, I says, 'Let's go; I am going to Nacogdoches and give up.' I did not know at that time how bad Mr. Box was shot. The other barrel of my gun was loaded; I didn't shoot the second time because Mr. Box was not making any pretensions then to do anything; I stopped when I saw I had disabled him. I then went to Nacogdoches and surrendered to Mr. Spradley. At the time I fired the shot I could see Mr. Box's body—well, I will say from his knees up. The handcar was standing on the south end of the cut; it was not up in the deep part of the cut; it was out of the cut. The first row there in the field curved in to the fence I will say ten

or twelve or eight or ten feet north of where I was sitting. I heard young Avery Box testify about where the car was and where those rows curved into the fence; his statement with reference to those rows as to how they curved there was just about correct. If Mr. Box had continued down to where the rows curved into the fence he would have struck the fence about opposite where I was at, he would not have missed me ten feet. Mr. Box never changed his speed at all when I told him to stop. I didn't have my gun and Mr. Box could not see my gun when I told him to stop the first two times; he never saw my gun until I told him to stop the third time."

On cross-examination he testified: "I didn't say when I first got down there that I saw Mr. Box going back in the direction of his house; when I first did see him, though, he rode around and rode around through the field. When I first saw Mr. Box he was on the west side of the track and on the west side of the handcar. Mr. Box come up down here some place, I don't know where, but he rode around through here and went on back down here and went out of sight (indicates on plat). He went out of sight over the hill on the south side; he didn't go out of sight towards his house that day, he went south; I didn't see him cross the railroad and go in the direction of his house that day; I didn't see him after he went over the hill until I saw him coming back behind me with his hand in his bosom; Mr. Box was dressed in his shirt sleeves; I don't know whether it was a hickory shirt he had on or not, I was not looking at his shirt; he didn't have on a vest; he just had on a shirt and a pair of pants as far as the clothes were concerned, and I saw him about seventy-five yards. I would say that Mr. Box must have been something like forty yards from me at the time I shot him, something like that, just guessing at the distance; he had walked about thirty-five steps coming walking up one of those rows, let me show you (indicates on plat), one of these rows that points out here, you have got the rows running out over here, but they come in here (indicates), and he was coming up something about like this row here, walking up one of those rows; he had walked up one of those rows thirty-five steps with his hand in his bosom and was looking right at me, and he had his hand in his bosom when I first saw him coming towards me, and I says, 'Stop, Mr. Box; don't come up on me with your hand in your bosom.' I said that when I first saw him he had done come closer, though after I first saw him before I said that; I don't know how many steps I let him take before I said that; I didn't say it when I first saw him; when I looked around he was coming and I saw he was still approaching me; I didn't wait but a short time after I first saw him until I told him to stop, he had walked eight or ten steps; I said it loud enough for you to have heard it if you have been 300 yards away; the second time I said it the same way, I says, 'For God Almighty's sake, Mr. Box, stop.' He could have heard that 300 yards away. The third time I said it the

same way, I didn't get any louder, just about the same, and he continued to come; he just continued to come and look right at me with his hand in his bosom. There was an embankment, a little dirt, on the west side of that track about the point where I was; that embankment I reckon was something like twelve or fifteen inches high; there was a low place in between me and him and it was kinder filled up there with dirt, and he was a little higher than this place was down here coming over a little kinder of a knoll; I couldn't tell you whether the embankment struck me about the knees or not; it did not strike me about the waist; I could see him from his knees up, I think from a little below his knees. As I holloed stop the last time I goes right down and picks my gun up and cocked it, and just as I halloed I got it to my face and shot just as quick as I could get it up. I said that I saw Mr. Box drawing something black out of his shirt bosom; I could not tell you what it was he was drawing from his bosom, it was just a black object he had; I could see something black in his hand right in here (indicates in his own hand). Mr. Box was walking practically with his right side to me with his right hand in his bosom. I saw the black in his hand and I was about forty yards away from him, and when I saw that I shot him and he fell, I didn't know how bad he was hurt; I didn't hear it; I didn't go to Mr. Box; none of my men, the three Mexicans nor John McCuistian nor John Mayfield nor Ed. Long went to him; those two boys is all the people I saw in the field; I knew where the little boys were at the time, one was going one way and the other the other way; there was one north and one south of Mr. Box, but as to which way they were going I couldn't say. There was a four wire fence between me and Mr. Box. North from the place from which I shot, the embankment got higher than a man's head; it was, I guess, thirty yards before it got that high. I was not between the railroad and the wire fence; I was not standing on the track, I was sitting down with my back towards Mr. Box; I was right at the corner of the handcar; I just stepped off and got my gun and picked it up."

The statement of facts states this: "It is agreed in this case that from the point where Mr. Box's body was to the wire fence was twenty-seven feet two inches; from the wire fence to the edge of the cut forty-two feet; from the edge of the cut to the edge of the ties ten feet." This shows without any doubt that the deceased was seven-nine feet two inches from the appellant at the time the appellant shot and killed him, and that the deceased had walked in the same general direction for more than forty-eight yards in full view of the appellant, the appellant watching him all this time, before he killed him. The uncontroverted testimony also shows that all the wounds inflicted by the appellant when he shot deceased with his double barreled shotgun loaded with buckshot were on the right side of deceased —none of them in front. One shot entered his neck two inches be-

low his ear on the right side; another just above his right shoulder
and one came out on the back of his neck about where it joined the
spinal column; another in front of his shoulder.    Two others went
through his right arm and entered the right side of the body just
a little below the nipple line.    These two bullets went straight
through the body from side to side, except that they did not go
through the skin on the left side, stopping just under the left arm
and a little higher up than the entrance, nearly on a line with the
nipple on the left side.    Another bullet glanced the larynx, cutting
the skin; still another cut the waistband of his trousers and just
glanced.    All of these bullet wounds came from the direction of the
right side of the deceased and all went in the same direction.    These
wounds demonstrate by the physical facts that the deceased was at
the side of the appellant when he killed him and was not facing him.
The tracks of the deceased, without controversy, as well as the testi-
mony of the appellant and others show that the deceased was walking
in an ordinary gait and going in the same general direction.    There
is no indication that he stopped and turned around.    In fact, the
testimony of appellant himself shows that he did not stop nor turn
around, except that he said he turned his head.    The testimony of
the deceased's two boys—one his son, the other his stepson—who
were plowing his corn along where the deceased was killed, shows that
neither of them heard the appellant at any time call to the deceased
to stop or said anything else to him in such a tone of voice as that
they could hear.    One of these boys was nearly as close to the appel-
lant at the time he killed deceased as was deceased.    The other was
some distance, but much nearer than three hundred yards.    In fact,
the farthest is shown, by uncontradicted testimony, to have been only
thirty steps from the deceased when he was killed, which would place
him less than seventy-five yards from the appellant at the time of
the killing.    The other was shown to have been only forty feet from
the deceased at the time he was killed and the position where he
was shown to have been would place him nearly as close, if not
nearer, to the appellant than was the deceased.    The testimony, taken
as a whole, also shows, in effect and practically without contradic-
tion, that the appellant from the time he first saw the deceased ap-
proaching in his direction he (appellant) was behind an embank-
ment, the appellant being very near thereto.    This embankment was
such as to have prevented the deceased from seeing him.    He testi-
fied that over it he could see the body of the deceased from about the
knees upward.    The physical facts, as well as the testimony other-
wise, show that the deceased did not hear appellant call to him to
stop, even if appellant so called, and had not seen, and did not know,
that the appellant was anywhere near at hand.    Deceased was not
facing him and was not coming directly towards him when he was
killed.

It will be seen by this, and we think it is very clearly shown, that

there were but two theories in the case and from the evidence that there could be but two. One of these was perfect self-defense on the part of appellant. The other was that of the State that it was murder in one of the degrees and not self-defense, the State contending that the evidence justified the jury to believe that it was in effect an assassination by the appellant of deceased.

Our manslaughter statute has two necessary requisites which are required to make an unlawful killing manslaughter, to wit: "Sudden passion" and that that passion "must arise from an adequate cause." If either of these requisites are lacking the offense can not be manslaughter, but must be murder in one or the other degree. In McKinney v. State, 8 Texas Crim. App., 645, Presiding Judge White, for this court, said: "A killing upon such sudden passion as is mentioned may be murder in the second degree, even though the passion was anger, rage, sudden resentment, or terror, rendering the mind incapable of cool reflection. To make such killing manslaughter, there must actually have existed not only such state or emotion of the mind, but the adequate cause which produced them must also exist. Penal Code, article 702. Insulting words or gestures, or an assault and battery so slight as to show no intention to inflict pain or injury, may be sufficient to cause the emotions of the mind known as anger, rage, sudden resentment, or terror, to the extent even of rendering it incapable of cool reflection, and yet a killing under such circumstances would not be manslaughter. Why? Because such insulting words or gestures, or such assault and battery, are not adequate causes (Penal Code, article 701), and manslaughter can not be predicated upon any voluntary homicide upon sudden passion not arising from an adequate cause. Penal Code, article 698." This decision has, many times, been quoted and approved on this point. See Clore v. State, 26 Texas Crim. App., 624; Hill v. State, 11 Texas Crim. App., 456; Neyland v. State, 13 Texas Crim. App., 536; Childers v. State, 33 Texas Crim. Rep., 509; Blackwell v. State, 29 Texas Crim. App., 194; Miller v. State, 31 Texas Crim. Rep., 609; Jones v. State, 31 Texas Crim. Rep., 422.

It is well established by the decisions of this court that if the case is either murder or perfect self-defense it is not error to fail to charge on manslaughter. Williams v. State, 2 Texas Crim. App., 271; Grissom v. State, 4 Texas Crim. App., 374; Homberg v. State, 12 Texas Crim. App., 1; Self v. State, 28 Texas Crim. App., 398; Angus v. State, 29 Texas Crim. App., 52; Floyd v. State, 29 Texas Crim. App., 348; McGrath v. State, 35 Texas Crim. Rep., 413; Lanz v. State, 48 Texas Crim. Rep., 2; Jirou v. State, 53 Texas Crim. Rep., 18; Shelton v. State, 54 Texas Crim. Rep., 588; Ward v. State, 59 Texas Crim. Rep., 62, 126 S. W., 1145; Cannon v. State, 59 Texas Crim. Rep., 398, 128 S. W. Rep., 141; Dougherty v. State, 59 Texas Crim. Rep., 464, 128 S. W., 398; Jennings v. State, 60 Texas Crim. Rep., 421, 132 S. W. Rep., 473; Hardcastle v. State, 36 Texas Crim.

Rep., 555; Eggleston v. State, 59 Texas Crim. Rep., 542, 128 S. W. Rep., 1105; Alexander v. State, 63 Texas Crim. Rep., 102, 138 S. W. Rep., 721.

Upon the whole of the testimony we think it clear that there was no "sudden passion" aroused in appellant at the time of the killing. In our opinion the testimony repels this idea. In his own testimony he did not even say that at the time of the killing there was aroused in his mind any sudden passion of either rage, anger, sudden resentment or terror which rendered his mind incapable of cool reflection. On the contrary, the evidence demonstrates to us that he was cool and perfectly at himself. In addition to much other testimony of other witnesses and of his own testimony, he testified, as quoted above: "I was standing right at the north end of the handcar when I shot; when I shot I just went back and laid my gun down on the handcar and told the boys, I says, 'Let's go; I am going to Nacogdoches and give up.' I did not know at that time how bad Mr. Box was shot. The other barrel of my gun was loaded. I didn't shoot the second time, because Mr. Box was not making any pretentions to do anything. I stopped when I saw I had disabled him."

Very recently appellant has filed a supplemental brief and argument contending, in addition to what was said in his original brief, in effect, as we understand it, that the evidence in this case would have justified the submission of manslaughter to the jury on the theory that when appellant shot and killed deceased the jury might believe he "acted with *undue precipitation* against the demonstration of deceased;" and that when threats by deceased are shown to have been made and there is evidence of an overt act by the deceased at the time of the killing "and any evidence from which the jury could conclude that the defendant acted with *undue haste* against the demonstration," by deceased, that the issue of manslaughter is in the case.

In his argument on these contentions, he lays down some legal propositions and cites numerous authorities to support his legal propositions. The legal propositions he lays down may be correct, but their application to this case is quite a different question. It is unnecessary for us to take up and discuss his propositions, or call attention to the authorities he cites to support them, because, in our opinion, they are inapplicable to the facts and law of this case.

The effect of appellant's contentions on these questions is that if there is only slight evidence in the record from which a jury might conclude that the appellant at the time he killed the deceased had adequate cause from which there arose in him at the time, sudden passion of anger, rage, resentment or terror, that it was reversible error for the court to refuse to submit manslaughter under such possible conclusion by the jury. Such a theory has long since been exploded by many of the opinions of this court, notably, by the opinion of Judge Hurt in Davis v. State, 28 Texas Crim. App.,

542, wherein he quoted and · approved the opinion of Chief Justice Roberts in Bishop v. State, 43 Texas, 390, to the same effect. He said: "Of what degree of force must the evidence be that tends to establish an offense, or tends to mitigate the offense charged in order to require a charge applicable thereto? Chief Justice Roberts says that if its force is deemed to be very weak, trivial, or light, and its application remote, 'the court is not required to give a charge upon it.' 'If, on the other hand, it is so pertinent and favorable as that it might be reasonably supposed that the jury could be influenced by it in arriving at their verdict, the court should charge so as to furnish them with the appropriate rule of law upon the subject.' Bishop v. The State, 43 Texas, 390. Hence, unless the evidence tending to present a less degree of an offense, or any theory of defense, be so pertinent and forcible that it might be reasonably supposed that the jury could be influenced ·by it in arriving at their verdict, a failure of the court to charge thereon would not be ground for reversal in the absence of exceptions.

"This position is in exact harmony with the first opinion in this cause, and in accord with Bishop's case, supra, and a number of cases decided by this court, notably Cunningham's case, 17 Texas Court of Appeals, 89; Elam's case, 16 Texas Court of Appeals, 34, and Leeper's case, decided at the present term, but not yet reported. See also Johnson's case, 27 Texas, 757.

"Loose expressions upon this subject can ·be found in the opinions of this court, but the principle is well settled and is absolutely correct, whether this court has always adhered to it or not, that in the absence of exceptions to the charge of the court, for this court to reverse, the evidence tending to present a phase of the case or theory favorable to the accused must be so pertinent and favorable that it might reasonably—not possibly—be supposed that the jury could be influenced by it in arriving at their verdict. Unless the evidence be of such a character no injury appears, no injury is probable—not possible, but probable—and unless this appears there is no ground for reversal; and to reverse in the absence of probable injury would be contrary to principle."

This holding was before the Code of Criminal Procedure, article 723 (old), was amended in 1897. Then this article required a reversal. Now and since 1897 the statute is the reverse of what it had been. It now says "the judgment shall *not be reversed* unless the error . . . was calculated to injure the rights of the defendant." This statute has all the time been held to be remedial by this court.

Again, in the opinion of this court by Special Judge ·Cobb, in Wilson v. The State, 60 Texas Crim. Rep., 1, he said: "It is not incumbent on the trial court, nor proper, to instruct upon manslaughter where there is no testimony, or where there is a mere suggestion or hint of facts that might show manslaughter. Such a mere

semblance of proof or so slight proof as no sensible juror would hang a question upon. What must be shown or put in the balance of reasonable doubt before the issue of manslaughter is required to be placed before the jury? We regard the statute as plainly requiring that there must be some proof tending to show that the homicide was committed under the immediate influence of sudden passion; that there was such cause of or provocation producing the passion as would produce in persons of ordinary temper a degree of anger, etc., sufficient to render them incapable of cool reflection, and that such condition of mind was in the slayer when he committed the deed." Maxwell v. State, 31 Texas Crim. Rep., 119; Cannon v. State, 41 Texas Crim. Rep., 467; Alexander v. State, 63 Texas Crim. Rep., 102, 138 S. W., 721.

In our opinion the case of Jennings v. State, 60 Texas Crim. Rep., 421, is very similar to this, and if anything, came much nearer calling for a charge on manslaughter than this case. The court in that case, through Judge McCord, stated the facts and held as follows: "Deceased was the father-in-law of appellant, and was violently opposed to the marriage of his daughter to appellant, and went before a justice of the peace and made an affidavit, charging defendant with both perjury and incest, in that defendant was related to deceased's daughter, defendant being a first cousin of the wife of deceased, and a second cousin of his own wife. The defendant was arrested. The testimony discloses that deceased made several threats against the life of defendant, and swore that he should never live with his daughter and that he intended to separate them. Deceased carried his gun wherever he went, and neighbors tried to interfere, and keep both defendant and deceased from going armed. On the day of the difficulty, which occurred in the town of Shamrock, defendant was at work unloading a car of coal. The deceased in company with a man by the name of Bradley, passed within seventy-five yards where defendant was unloading coal, deceased having a Winchester rifle on his saddle. Soon after deceased passed, a witness by the name of Davis went to the closet and while there heard deceased and Bradley talking, in which deceased, among other things, said: "Yes, my cartridges and gun are alright, and they will get Jennings (defendant)." The witness Davis returned immediately and told defendant of this; defendant then went and procured a gun and went to a storehouse in the town and as deceased crossed the street coming in the direction of the store where defendant was, deceased having his gun and also being armed with a pistol, defendant shot him. We do not think the facts call for a charge on manslaughter; the testimony for the State makes out a case of murder; from the defendant's standpoint, a case of self-defense, simply because self-defense is in the case, it does not follow that necessarily the court must charge on manslaughter. Issues rising from the testimony alone should be submitted to the jury."

Again, in the case of Blount v. State, 58 Texas Crim. Rep., 509, this court, through Judge McCord, after giving a statement of the evidence and saying it did not call for a submission of manslaughter, said: "It is true that the defendant proved threats had been made against her life by deceased. However, the testimony is wanting that deceased was doing anything at the time manifesting the intention of carrying the threats into execution. However, no complaint is made of the charge of the court other than the failure of the court to charge upon manslaughter. We do not think that the facts of the case called for a charge on manslaughter, and that the court would have been in error to have submitted the issue. On the 27th day of December, 1908, at a sawmill called Manning, the deceased was killed by appellant. The appellant had been the mistress of deceased and they had been living together up to about a week before the killing. The deceased quit living with appellant and went to another negro's house by the name of Cumbo and had been boarding there about a week; the deceased was living about a mile from where the killing occurred at a section house. On that Sunday evening Hattie Blount came into the house of Ellis DeWalt and asked Andrew Kirkland, who was in there, to lend her his pocketknife. Kirkland said he had no knife; there was a double-barrel shotgun lying on the bed; appellant picked it up and unbreeched it; Kirkland told her to put that gun down, it was loaded; she breeched the gun and remarked that was all right, or that was what she wanted. Kirkland holloed at her to put the gun down. The appellant ran out at the back door to a water closet and Fred Terry was coming up the road and Kirkland holloed and told him not to come on, that that gun was loaded; the appellant said stop; the deceased looked up and said, 'What did you say?' Appellant threw the gun to her shoulder and fired and killed deceased. After the appellant fired the gun she ran off. At the time she shot she was in the path going facing Terry, who was coming on up the path. The witness spoke of defendant as being drunk on that day. The appellant took the stand and testified as to the immediate killing; after going ahead and telling of being a cook for the deceased, and denying that they were living together as man and wife, and saying that the deceased was mad at her because she would not become his paramour, and that she went off and left him and he brought her back, she states that on the day of the shooting she went to Manning in the morning to the section house; that she got a gun at Ellis DeWalt's, got it because she was scared of deceased because he had threatened to kill her; that she knew if she did meet him he would do something to her, and she says that when she met him deceased asked her where she was going, and she replied that she was fixing to go to the section house, and deceased told her that she was not going anywhere; that she replied that she was going to the section house, and the deceased kept walking up toward her and she said, 'Don't come on me,' and that Andrew Kirkland holloed to him

not to go up there and deceased said he did not give a damn, when appellant says, 'What do you want?' and the deceased replied that if he got up to her and got that gun she would see, and that the deceased kept coming and she shot him.   There is not a suggestion of manslaughter in this record and the court properly refused to submit the issue of manslaughter to the jury."

Again, in the case of Dougherty v. State, supra, this court, through Judge Ramsey, in substance, said: From a careful inspection of the record, and the most mature deliberation, we have become convinced that manslaughter was not in the case, nor raised by the evidence. In the case of Potts v. State, 56 Texas Crim. Rep., 39, 118 S. W., 535, we said: "The law implies malice from the fact of an unlawful killing, in the absence of proof of express malice, and where there is nothing in the evidence to reduce the grade of homicide to manslaughter, or to some lesser degree.   It is not the law, as we have frequently held, that every killing done from a rash and inconsiderate impulse is manslaughter, but to reduce an unlawful killing to the grade of manslaughter, adequate cause must always exist which renders the mind incapable of cool reflection.   There is no suggestion in this case of adequate cause."   Again, in the case of Ford v. State, 50 S. W., 350, it was held that where one accused of murder testified that deceased drew a razor and attempted to cut him, but no pain or bloodshed was caused, and there was nothing else to show any adequate cause for defendant's passion, a charge on manslaughter was properly refused.   In that case, Judge Henderson, speaking for the court, says:   "We have examined the record carefully, and fail to find any manslaughter in the case.   Whatever may have been the passion excited in appellant's mind, the record utterly fails to show any adequate cause for such passion.   Appellant's own evidence, if it is to be credited, would suggest the theory of self-defense at the inception of his attempt to take the life of deceased.   He says that the deceased drew a razor on him and attempted to cut him, but even from his own testimony there is no evidence of any assault on him inflicting pain or bloodshed.   The court gave a charge on self-defense, and we fail to see any predicate for a charge on manslaughter."

There is nothing in appellant's contention, by his said supplemental brief, in attempting to distinguish the cases of Lenz v. State, supra; Jirou v. State, supra, and Shelton v. State, supra, from this in contending that in each of those cases the parties were *so close* to one another at the time of the killing, that manslaughter did not arise in either of them, wherein this because deceased was about twenty-eight steps away, that the issue or theory of whether defendant acted with *undue precipitation* against the demonstration of the deceased and killed him with *undue haste,* did raise manslaughter in this case. On the contrary, as contended by the State in reply to appellant's supplemental brief on this subject, we are of opinion that it would

be a wrong doctrine for this court to say that simply because deceased, at the time he was killed by appellant, was about twenty-eight steps distant from him that the issue of manslaughter was thereby raised; whereas, if he had only been a few yards or feet from him, it would not be raised. It occurs to us that if anything, the reverse of this would be true—that the nearer the deceased was when he made, if he did, a hostile demonstration, the more apt it would be to arouse in appellant some such sudden passion as anger, rage, resentment or terror—the farther off the less liable to arouse such passion. The doctrine contended for by appellant, in our opinion, is against reason, common experience and observation.

In our opinion the evidence does not show, or tend to show that the killing of the deceased by the appellant "was under the immediate influence of sudden passion," nor that if there was such passion, it "arose from any adequate cause" whatever. So that, manslaughter was not in the case and the court did right in not submitting it to the jury.

The only other contention by appellant in his brief is, he claims the court erred in the charge on self-defense. He requested no charge on the subject. But the record shows that he excepted to the charge of the court on that subject substantially on the following grounds:

(1) Because it was an undue limitation and restriction upon his right of self-defense in that the jury were required to find and believe that the deceased at the time defendant shot him was making an actual attack upon appellant with a pistol before appellant could be acquitted, claiming that under the law the appellant had the right to shoot and kill the deceased if it reasonably appeared to him that the deceased was about to attack him for the purpose of killing him or doing him serious bodily harm or executing the threats which he had made against him and which had been communicated to him.

(2) The said charge nowhere distinctly and affirmatively instructed the jury that they must view the transaction from the defendant's standpoint in passing upon his right of self-defense, claiming that it was incumbent upon the court to clearly, affirmatively and distinctly so instruct the jury.

(3) That the same was an undue limitation and restriction upon appellant's right of self-defense predicated upon threats made by the deceased against him and communicated to him in that it required the jury to believe that even though the threats had been made and communicated to appellant that they must further find before defendant would be justified that deceased was making an actual attack upon him with a pistol, claiming that under the law, because of such communicated threats, the appellant would be justified if deceased did any act which, viewed from appellant's standpoint, manifested the deceased's intention of carrying such threats into execution.

(4) Because said charge was an undue limitation and restriction upon appellant's right of self-defense in that such right was bur-

dened by the charge with an affirmative charge presenting the theory of the State after the same had already been presented to the jury and the issue of self-defense was given negatively instead of being clearly, affirmatively and . distinctly given in behalf of appellant and that it was crowded and permeated throughout by holding out too prominently the opposite theory to that ·of self-defense.

(5) That it was upon the weight of the evidence, argumentative, and held out too prominently to the jury the theory of the State, and more prominently the theory of the State, than that of the defendant, thus leading the jury to the conclusion that the court was of the opinion that the issue of self-defense was not supported by the evidence and that defendant was guilty of either murder in the first or second degree.

(6) It does not clearly, distinctly and affirmatively instruct the jury upon the issue of self-defense predicated upon threats upon appearance of danger upon which the appellant relied in that the charge throughout holds out too. prominently to the jury that before the defendant would be- justified they must find and believe from the evidence that the deceased was making an actual attack upon him with a pistol, thereby restricting his right of self-defense against a real and dangerous assault then being made upon him by deceased with a deadly weapon, thus ignoring the right of defendant to act upon the appearance of danger as viewed from his standpoint.

In order to show this matter properly it will be necessary to copy the charge of the court in full on the subject of self-defense.

The court in his charge first stated the issue; then defined murder in the first and second degrees, properly defining both express and implied malice. There is no special objection of merit, if at all, to any of the court's charges on these subjects.

The full charge of the court on self-defense is as follows: "12. Homicide, which means the killing of one person by another, is in self-defense and is justified in law when inflicted for the purpose of preventing the murder of the person killing when the killing takes place under the following circumstances:

"1. It must reasonably appear by the acts of the person killed that it was the intent and purpose of such person unlawfully to kill the defendant or to inflict on him some serious bodily injury.

"2. The killing must take place while the person killed was in the act of committing such unlawful violence upon the defendant, or after some act done by him showing evidently an intent to inflict such death or injury upon defendant; and when the killing takes place under the circumstances above mentioned and it is shown that the deceased used or attempted to use a weapon or instrument calculated to produce death or serious bodily injury then it is presumed he intended to inflict such injury upon the defendant. The defendant whose person is so unlawfully attacked is not bound to retreat in order to avoid the necessity of killing his assailant.

"13.   When a defendant seeks to justify a killing upon the ground of threats against his own life, he may be permitted to introduce evidence of the threats so made, whether they were communicated to him before the killing or not; but such threats, if made, shall not be regarded as affording a justification for the killing unless it be shown that at the time of the killing the person killed, by some act then done by him, manifested an intention to execute the threats so made.   And if you believe the deceased, if killed by defendant, had made such threats against defendant and that at the time of the killing, the deceased, by some act then done by him, such as making a motion as if to draw a pistol from his bosom, or otherwise manifested an intention then to execute such threats, then the killing would be in self-defense and justifiable; or if you believe from the evidence that Eli Box, if killed by defendant, had threatened the life of defendant, T. S. Treadway, and defendant knew of the threats, or if defendant had been informed that his life had been so threatened by deceased and believed such information to be true, whether true in fact or not, and that at the time of the killing Eli Box by some act, then done by him, such as making motion as if to draw a pistol from his bosom, or otherwise manifested an intention to execute the threats so made or so communicated to and believed by defendant, then defendant is justifiable on the ground of self-defense. And if you so believe the facts to be that defendant thus acted in self-defense, or if you have a reasonable doubt as to whether or not such is the truth of the case you will acquit the defendant.   But if deceased at the time of the killing was doing no act or acts which manifestly or reasonably appeared to manifest an intent to carry his threats, if any, so made or communicated to defendant into execution then the threats would not constitute a justification.

"14.   If, at the time of the killing, Eli Box was advancing or had advanced upon the defendant and was making a motion with his hand or hands as if to draw a pistol from his bosom, and, by such acts, or otherwise, was making such demonstration as under all the attendant and antecedent circumstances was calculated to produce in the mind of defendant a reasonable expectation or fear of death or of some serious bodily injury then about to be inflicted upon him, and defendant killed him in order to protect himself, then the killing was in self-defense and defendant is not guilty, and if from the evidence you believe the facts so to be, or if you have a reasonable doubt as to whether or not such is the truth of the case you will acquit the defendant.   In such case, in order to justify defendant, it is not necessary that the danger should be real; in other words, that Box, in fact, had a pistol.   It would be sufficient if the appearances, as viewed from the defendant's standpoint, were sufficient to produce in his mind a reasonable belief that Box had a pistol and was in the act of drawing it, and the reasonable apprehension of the

loss of his life or of some serious bodily harm therefrom, then apparently about to be inflicted upon him by deceased.

"15. You are further instructed as a part of the law of self-defense that it is not essential to the right of self-defense that the danger should in fact exist; if, to defendant, it reasonably appeared that the danger in fact existed he had the right to defend against it to the same extent and under the same rules which would obtain in case the danger had been real. The defendant may always act upon reasonable appearances of danger and whether the danger is apparent or not is always to be determined from the standpoint from which the defendant viewed it at the time he acted.

"21. The defendant had the right to be upon that part of the railroad right of way passing through land belonging to the deceased, no matter if Box objected, the same as upon any other portion of the line of railroad, and to take and have his gun with him if he thought proper to do so, and if, while there, and having his gun, he was unlawfully attacked by Box, his right of self-defense, as hereinabove explained to you, would in no manner or degree be lessened or limited by reason of his being at such place and having his gun with him; these facts, if true, are before you as mere circumstances in the case and may be considered by you only in so far, if at all, as they may tend, in connection with the other circumstances in the case, to explain and throw light upon the motives and intent with which defendant acted on the occasion of the homicide and the good faith or otherwise, or his claim of self-defense."

As we have decided above, there was no question of manslaughter in the case and the court did right in not submitting any such issue. Neither was there, by implication or otherwise, any question of negligent homicide.

Appellant, by his attorneys, has filed a very able, forceful and clear brief in this case, besides making a vigorous and clear oral argument when it was submitted. In their brief on this subject, under their six objections to the court's charge above noted, they lay down propositions and cite numerous authorities such as (1) when the evidence discloses the deceased was about to attack the appellant, or was making a threatening attack, it is reversible error for the court to define and restrict the appellant's rights to defend only against an actual attack; (2) when the evidence raises the issue of self-defense, predicated upon communicated threats, it is error for the court in his charge to restrict the appellant's right to defend against a particular act of the threatening party, claiming the court should instruct the jury if the deceased did *"any"* act which manifested his intention to execute the threats that the appellant would have the right to shoot and kill; (3) it is always incumbent upon the trial court to instruct the jury in connection with the issue of

self-defense that the entire transaction must be viewed from the appellant's standpoint and no other.

All of these propositions might be conceded to be correct as principles of law generally. Their application, however, to a given case may, or may not, be necessary. From an examination of the charge of the court copied above, as applied to the facts of this case, each and every one of these principles where proper or necessary, were aptly and appropriately given and applied in this case.

It is elementary that the whole charge of the court must be considered together, and if, taken as a whole, it fairly, aptly and properly submits the questions to the jury which are raised by the testimony, it is universally held to be good, even though some particular paragraph, by itself, or some particular word or phrase in the charge, taken by itself, if it stood alone, might be subject to some criticism.

The attorneys representing the State, Messrs. Blount & Strong, Hon. W. B. O'Quinn, District Attorney, and Hon. C. E. Lane, Assistant Attorney-General, have filed herein such a clear presentation of this matter in their brief, we will here copy it in substance, and adopt it as our opinion to the extent we copy it. It is:

"Appellant asserts three propositions on self-defense: First, they, in effect, attack the trial court's charge and claim that same restricts the right of the defendant in this case to defend only against an actual attack; second, that the trial court's charge predicated upon communicated threats restricts the defendant's right to defend against a particular act; third, that the trial court's charge fails to tell the jury that the transaction must be viewed from the defendant's standpoint. Now, in reply to the first proposition, we call attention to the trial court's charge in applying the law to the facts of this case, shown by the court's whole charge on self-defense. The issue of self-defense was raised, alone, in this case by the testimony of appellant copied above.

Now, the court in paragraph fourteen of his charge, as above set out, tells the jury, in applying the law to the facts of this case, in effect, that if they believed this statement to be true, or have a reasonable doubt thereof, that they will acquit the defendant, and in addition thereto in paragraph fifteen gives them a general charge on appearance of danger, and tells the jury, specifically, in both paragraphs that the transaction *must be viewed from the defendant's standpoint,* and it appears to us, to be absurd for counsel for appellant to undertake to contend that the court limited the right of self-defense in this case to an 'actual attack,' in view of the two paragraphs of the court's charge above referred to, and we content ourselves, in reply to this proposition by directing careful attention to the above paragraphs of the trial court's charge, and we also respectfully call attention to the case of Newcomb v. The State, 49 Texas Crim. Rep., 550. In that case, Judge Henderson, speaking for the court, on page 561, uses this language: "The charge on self-defense

it is urged deprived appellant to defend on apparent danger. We do not believe it is subject to this vice. The court in this charge distinctly tells the jury that it is not necessary that there should be actual danger, provided he act upon a reasonable apprehension, as appeared to him from his standpoint at the time. "And furthermore tells the jury if they believe that deceased was, at the time, making an attack on him or was making an effort to procure a pistol, or was in the act of procuring a pistol, with the intention or apparent intention, of inflicting death or serious bodily injury upon the defendant as it then reasonably appeared to the defendant that he was thereby put in fear, etc., he had a right to take the life of deceased, and the jury should acquit him. It occurs to us that this charge adequately preserves to appellant his right to defend upon apparent danger.'

"The charge of the trial court in the instant case is much more clear and specific in presenting defendant's right of self-defense, under appearances of danger, than the charge of the trial court was, as indicated by Judge Henderson's opinion in the Newcomb case, supra.

"Counsel for appellant in their brief cite the Poole case, in the 45 Texas Crim. Rep., 348, and quote therefrom in support of their theory upon this phase of the instant case. The authorities cited by counsel might be applicable, if in fact the trial court in the instant case had limited appellant's right of self-defense to an *actual attack,* as was done in the Poole case, supra; but a mere glance at the trial court's charge on self-defense in applying the law to the facts of this case will convince one that counsel for appellant are in error, in contending that the law of self-defense based upon the appearances of danger, was not fairly presented in the charge of the court.

"The extract contained in appellant's brief from the charge of the trial court on self-defense is an extract from that portion of the charge of the trial court, wherein he tells the jury that appellant had the right to carry his gun to the place where the killing occurred, and the court is not undertaking, in that portion of his charge, to present to the jury the law of self-defense, but is charging on an entirely different matter, and, specifically, refers in that charge to the charges which he has already given the jury on self-defense, and it certainly can not be contended that because the court used the general expression 'unlawfully attacked,' in this portion of his charge, that it could have been construed by the jury as a limitation upon appellant's right of self-defense, which right had been fully and fairly, theretofore, presented in another portion of the charge. As is well said by Judge Henderson in the case of Bryant v. The State, 47 S. W. Rep., 373: 'This is not a fair method of criticism of the trial court's charge, but same must be looked to as a whole.'

"In reply to appellant's second proposition, under self-defense, we

call attention to paragraph thirteen of the court's charge, above copied. Now, counsel for appellant contend that this restricted appellant's right of self-defense, predicated upon communicated threats, to a particular act committed by· deceased, but an examination of the charge is a complete answer ·to this, for the trial court, plainly, tells the jury: 'That, if at the time of the killing the deceased, by *some* act then done by him, such as making a motion as if to draw a pistol from his bosom, *or otherwise*,' etc., merely giving an illustration by using a phrase, 'as if drawing a pistol,' and besides there was absolutely no testimony in the record, even suggesting any other act upon the part of deceased at the time of the killing. The defendant, himself, bases his defense and his right to act at the time he did act upon the *sole* proposition that at that time the deceased was attempting apparently to draw a pistol for the purpose of taking his life, and while the court did not do so, he would have· clearly, under the law, been warranted in limiting the defendant's right to act to the proposition as to whether or not the deceased was apparently in the act of drawing a pistol, as that was the only overt act on the part of the deceased, raised by the evidence, and we submit that the case of Lockhart v. The State, cited by appellant in support of this proposition, does not tend, in any way, to substantiate the argument offered by counsel.

"By their third proposition counsel for appellant assert that the court failed to charge the jury that they must view the transaction from the defendant's standpoint. In paragraph fourteen of the court's charge will be found this language: 'It would be sufficient if the appearances as viewed from the defendant's standpoint were sufficient to produce in his mind a reasonable apprehension that Box had a pistol,' etc.

"And in the fifteenth paragraph of the court's charge the court clearly and prominently holds out this matter and tells the jury in plain terms that the matter *must be viewed from the defendant's standpoint.*

"But appellant's counsel ingeniously seek out isolated portions of the court's charge, and direct the court's attention to these extracts, but we understand the rule to be, that the charge must be looked to as a whole, and if taken as a whole, it fairly submits the various issues raised by the testimony, it is sufficient.

"Judge Ramsey, in approving this rule, and quoting from Judge Henderson, uses this language in the case of Jirou v. State, 53 Texas Crim. Rep., 18:

"The charge is further asserted to be erroneous because, as claimed, by said charge the jury were required to find that the deceased made an attempt to execute his threats, and this attempt, in connection with the general charge, required the jury to believe that the deceased made an attempt to execute his threats by the use of a deadly weapon.

The case of Bryant v. The State, 47 S. W. Rep., 373, clearly states an old and well established rule, which should never be overlooked; but always applied in passing on the charges of inferior courts. Judge Henderson says: 'With reference to this charge, on self-defense, we would further observe that it is not a fair method of criticism as indulged in by appellant to take up and discuss isolated portions of the charge, when the charge viewed as a whole fairly covers every issue in the case.'

"Taking the trial court's charge in the instant case, as a whole, it not only fully and fairly presents the issue of self-defense, from every standpoint raised by the testimony in this case, but it presents said issues in an admirable way, and holds the defendant's theory of this case out *prominently* before the jury, and is more favorable to the defendant in many respects, than under the law he was perhaps entitled to. (See La Grone v. State, 61 Texas Crim. Rep., 170, 135 S. W. Rep., 121, and Young v. State, 61 Texas Crim. Rep., 303, 135 S. W. Rep., 127.) See the case of Jay v. The State, 56 Texas Crim. Rep., 111, and also the case of Jirou v. The State, supra, 53 Texas Crim. Rep., 18."

We believe that the charge in this case, taken as a whole, on the subject of self-defense, presents every phase of it in appellant's favor as favorable to him as the law would authorize or justify, and that, taken as a whole, it is not subject to any or either of the objections urged thereto. The charge, in our opinion, is substantially based upon, and in every essential particular is a statement of the law as contained in our statutes on the subject. Wherever an issue thereby is submitted to the jury, it is peculiarly and specially applicable to the evidence in the case. Certainly, under any and every view of it, and in contemplation of each and all of appellant's objections thereto and criticisms of it, under article 723, Code Criminal Procedure, this court is, in effect, prohibited from reversing the case.

We think it is unnecessary to further take up any or all of the appellant's said objections to the charge of the court. We have given a sufficiency of the evidence in this opinion to show that appellant's rights were properly guarded in every way by the charge of the court on this subject. Nor is it deemed necessary to cite the statutes or the decisions thereunder on self-defense, or threats in connection therewith. Having quoted the charge of the court above, and a sufficient statement of the evidence, it will be seen that the court's charge itself completely meets every one of appellant's objections thereto.

There are several other minor objections made by the appellant in his motion for new trial to some matters in the court below. None of them seem to have been deemed of sufficient importance by the able attorneys of the appellant for them to present or brief them. However, we have taken up and considered each one and it is our opinion that none of them present any reversible error.

The judgment of the lower court will, therefore, be in all things affirmed.

*Affirmed.*

[Rehearing denied March 6, 1912.—Reporter.]

DAVIDSON, PRESIDING JUDGE (dissenting).—In a very voluminous opinion my brethren have affirmed the judgment in this case. I am of opinion they are wrong in more questions than one in their opinion of affirmance. I desire, however, to especially enter my non-concurrence in writing to all of that portion of the opinion which holds that the trial court did not err in failing and refusing to submit for the consideration of the jury. the issue of manslaughter. Under the law as has been heretofore announced in this State, that issue is clearly raised and demanded by the evidence found in the record now on file in this court. Counsel for the appellant have filed a very able and rather an exhaustive brief, citing authorities, in which is presented this phase of the appeal in such satisfactory manner that I shall adopt it as my dissenting opinion on this question. The statement in the brief of the principle and questions involved and supported by the decisions of this State is so clear and forceful that I deem it unnecessary to undertake to add to what is therein said or to reiterate same in language of my own. I shall, therefore, adopt their argument as my reasons for dissenting. This brief was prepared by Messrs. King & King, V. E. Middlebrook, and Anderson & Davis, of counsel for appellant. That portion of their brief adopted reads as follows:

"A casual study of the facts; an investigation of this record, and a careful review of the authorities has convinced us beyond a doubt that the court erred in failing to submit the issue of manslaughter, and has satisfied us that the cases of Lentz v. State, 48 Texas Crim. Rep., 2; Jirou v. State, 53 Texas Crim. Rep., 18; Shelton v. State, 54 Texas Crim. Rep., 588, are clearly distinguishable from and not in point in the instant case, when fairly construed.

"It is well settled that if there is any evidence tending, though slight, to establish a defense, the defendant is entitled to a charge directly upon that point, no matter what view the court may entertain of the weight and value of the testimony. That manslaughter is a defense to murder is equally well settled, and, if it is an issue, its omission in the charge is harmful to a defendant, though the jury are charged to acquit if they find the facts to be as claimed by defendant, because a jury might not be—and usually is not—willing to acquit a defendant responsible in some degree, and a verdict of murder is rendered instead of one for manslaughter, where the verdict might be otherwise had they been permitted to consider manslaughter.

"It has been uniformly held that a defendant is entitled to a charge on the testimony introduced, and that it is immaterial from what source it comes: whether from the State or defendant, or from parts

of both.   Sowell v. State, 32 Texas Crim. Rep., 482; Harris v. State, 51 Texas Crim. Rep., 564; Keith v. State, 50 Texas Crim. Rep., 63, 94 S. W. Rep., 1044; McComas v. State, 75 S. W. Rep., 533; Lewis v. State, 48 Texas Crim. Rep., 614, 89 S. W. Rep., 1073; Brownfield v. State, 25 S. W. Rep., 1120; Bonner v. State, 29 Texas Crim. App., 223; Green v. State, 58 Texas Crim. Rep., 428; Lara v. State, 48 Texas Crim. Rep., 568, and many others.

"The sheer fact that there is proof of threats made by deceased will not of itself raise the issue of manslaughter.   If in addition to proof of threats made by deceased, and which were known to defendant prior to the homicide, the threatened or actual attack was so immediate, imminent and pressing as that, if true, the homicide was necessarily in perfect self-defense, so that the issue is *simply* murder or perfect self-defense, the issue of manslaughter is not in the case, and this is all that the cases of Jirou and Shelton hold.   In each of those cases the parties were so *close* that there was not, from any source, the issue or theory of whether defendant acted with *undue precipitation* against the demonstration of his adversary, or that he was about to be made to abandon a lawful occupation, and therein is the distinction between the Jirou and Shelton cases and the instant case.

"Whenever in connection with proof of threats known to defendant at the time of the homicide there is evidence of an overt act on the part of deceased and any evidence from which the jury could conclude that defendant acted with *undue haste* against the demonstration of his adversary, the issue of manslaughter is in the case.   The jury might conclude that he acted too quick, that deceased was too far away to have caused a reasonable apprehension of death or serious bodily injury, and that in connection with the proof of communicated threats and the other circumstances of the case, such as, in this case, the fact that defendant was where he had a right to be, that he had been frequently disturbed in his work, and had been notified not to work the right of way which separated the field of deceased, the mind of defendant became excited beyond cool reflection, and so while not justifiable he might be only guilty of manslaughter.   This proposition is fully supported by the following cases:   Rutherford v. State, 15 Texas Crim. App., 236; Bonner v. State, 29 Texas Crim. App., 223; Cooper v. State, 49 Texas Crim. Rep., 28; Rice v. State, 51 Texas Crim. Rep., 255; Floyd v. State, 52 Texas Crim. Rep., 103; Casey v. State, 54 Texas Crim. Rep., 584; Lee v. State, 54 Texas Crim. Rep., 382; Williams v. State, 61 Texas Crim. Rep., 356, 136 S. W. Rep., 771; Swain v. State, 48 Texas Crim. Rep., 98, and Franklin v. State, 48 S. W. Rep., 178.

"In the instant case, appellant testified that deceased was forty yards away at the time he fired the fatal shot.   That deceased refused to stop when requested.   Appellant had been ordered by his superior to fix the right of way and railroad track running through and sep-

arating the field of deceased, and was where he had the legal right to be. Deceased had declared that defendant should not work the right of way through his field, and this was known to defendant. Deceased had declared that he could not get on defendant with his gun and that he would have to resort to other means and this was known to defendant.

"It *ought to be remembered* that the conditions or circumstances which may constitute adequate cause are not restricted to those named in the statute as adequate cause; other causes may exist, and if there is evidence which supports the theory of adequate cause, the court is not the judge of its probable truth, but should leave it to the jury. Brown v. State, 38 Texas, 486; Johnson v. State, 43 Texas, 612; West v. State, 2 Texas Crim. App., 460; Guffee v. State, 8 Texas Crim. App., 187; Sterling v. State, 15 Texas Crim. App., 249; Williams v. State, 15 Texas Crim. App., 617; Wadlington v. State, 19 Texas Crim. App., 266; Childers v. State, 33 Texas Crim. Rep., 509; Rice v. State, 51 Texas Crim. Rep., 255.

"A sudden meeting whereby defendant became incapable of cool reflection and on insufficient grounds became apprehensive of death or serious bodily injury may in connection with previously communicated threats raise the issue of manslaughter. Howard v. State, 23 Texas Crim. App., 279; Swain v. State, 48 Texas Crim. Rep., 98; Yancy v. State, 48 Texas Crim. Rep., 166.

"It has also been held by this court that an act standing alone may not be a sufficient provocation, but may be ample when it is one of a series of similar acts, or when it has been preceded by an insolent and aggravated course of conduct, whether similar or not to the act committed at the time of the homicide. Wadlington v. State, 19 Texas Crim. App., 266; Johnson v. State, 22 Texas Crim. App., 206; Lienpo v. State, 28 Texas Crim. App., 179; Bracken v. State, 29 Texas Crim. App., 362; Baltrip v. State, 30 Texas Crim. App., 545; Adams v. State, 42 Texas Crim. Rep., 366. In this case it appears from the evidence that deceased had determined that appellant should not perform his duty in working the right of way dividing the field of deceased, and that deceased had been guilty of a series of overt acts and an aggravated course of conduct well calculated to arouse apprehension and fear in the mind of appellant, and if at the time of the homicide appellant thought this conduct was to be repeated it was for the jury to say whether this was or was not a 'condition or circumstance' such as would commonly produce a degree of anger, rage, resentment or terror in a person of ordinary temper sufficient to render the mind incapable of cool reflection. Childers v. State, 33 Texas Crim. Rep., 509; Gilcrease v. State, 33 Texas Crim. Rep., 619, and especially so when considered with reference to the distance between the parties and the extent of the demonstration testified by appellant, and in the light of the threats known to appellant and all other circumstances of the case.

"The dividing line between murder in the second degree and manslaughter may be often shadowy and indistinct, but in case of doubt, the doubt should be resolved in favor of appellant, and the issue of manslaughter submitted. Halbert v. State, 3 Texas Crim. App., 656; Arnwine v. State, 49 Texas Crim. Rep., 5. This is in strict conformity to the basic principle of our law, that the accused is presumed innocent until proved guilty beyond a reasonable doubt. All presumptions are legally in aid of innocence until guilt is shown. Manslaughter means innocence of murder. A doubt on facts at this point means doubt of law and requires the charge on manslaughter.

"If there is evidence which, however weak or inconclusive it may seem to the court, tends to prove facts from which the jury may deduce a finding of manslaughter, it is error to fail to charge on that issue. See authorities cited in Branch's Criminal Law, sec. 504, page 322.

"The distinction here has been almost uniformly recognized by the decisions of this court beginning with the Williams case, 2 Texas Crim. App., 287. For other authorities see Branch's Criminal Law, sec. 505. The evidence shows there are facts in this record from which the jury might have deduced a finding of manslaughter; that they could find that appellant acted with *undue precipitation* against the movements of deceased; that he did not wait long enough; that the circumstances surrounding the case and the excited way in which appellant spoke, the deceased's continuing to advance in the light of the previous actions and threats, and the change of threats of deceased may have produced such a state of mind as rendered him incapable of cool reflection, and may have, if permitted, not found him guilty of anything higher than manslaughter.

"In the Lentz case, 48 Texas Crim. Rep., 2, cited by the State, as well as in the Jirou and Shelton cases, the parties were so *close,* and there was such demonstration as that, if true, the defendants in those cases would have had a perfect right of self-defense, and would have, if they had acted as claimed, been acting in perfect self-defense, that there was no other evidence of adequate cause either singly or in connection with other facts. In neither of those cases were the parties so far apart as in the instant case; in neither of those cases was there a course of insolent and aggravating course of conduct in connection with an apprehension that it was about to be repeated at the time of the homicide; in neither of those cases was there such a lack of coolness and deliberation manifested, or proof of facts calculated to disturb the mind, and in neither of those cases was there as little proof of actual danger as in this case; in neither of those cases was there an issue that defendant may have acted *too hastily* and with undue precipitation with regard to the demonstration or attack of his adversary as in this case.

"The theories of a case are not limited by the testimony of a defendant. Bonner v. State, 29 Texas Crim. App., 230; Lee v. State,

54 Texas Crim. Rep., 385; Green v. State, 58 Texas Crim. Rep., 428. That the same testimony often does raise the issue of both manslaughter and self-defense is illustrated by many of the cases—though in the instant case there are many facts outside the testimony of appellant going not only to raise, but to illustrate and intensify the issue of manslaughter—and as said by Judge Ramsey in the Burnett case, 53 Texas Crim. Rep., 518: 'It is true the same testimony raises the issue of self-defense, but there is testimony in the record from which the jury might have believed that appellant was not justified either, under the doctrine of actual or apparent danger, in taking the life of deceased and yet would have been fully justified in holding that his mind was in such cóndition as to make the killing manslaughter.'

"Lee v. State, 54 Texas Crim. Rep., 382; Williams v. State, 61 Texas Crim. Rep., 356, 136 S. W. Rep., 771; Nelson v. State, 48 Texas Crim. Rep., 274; Miller v. State, 52 Texas Crim. Rep., 72; (Fuller v. State, 95 S. W. Rep., 1039); Harris v. State, 48 Texas Crim. Rep., 627.

"So there are facts and circumstances from which the jury might conclude that appellant, while not justified, acted too quickly upon the movements of deceased, when viewed in the light of all the previous threats and demonstrations, his open enmity and hostility to appellant, which while in a measure, might be justified from the standpoint of deceased, yet did not in any way lessen the rights of appellant, viewed from his standpoint. *Appellant was on trial and not deceased, a fact which is so often lost sight of by trial judges.*

"The criterion is not what the judge who tried the case may have believed as to the facts presenting the phase of manslaughter, but the question is, was there sufficient evidence to have required a charge on that subject? Arnwine v. State, 49 Texas Crim. Rep., 6. Here there is not only threats known to appellant at the time of the homicide, but instances of insolent, uncalled for and aggravating courses of conduct prior to the homicide, an effort and purpose to prevent appellant from doing what he had a right to do, from working where he had a right and where it was his duty to work, coupled with an advance at some distance, and a refusal to stop when requested, coupled with the threat of deceased only the day before to resort to other means than shotgun, and coupled with a hostile demonstration at the time of the homicide at such a distance from appellant as that the jury might reasonably conclude that appellant acted with undue haste in shooting, and taken in connection with the requests of appellant for deceased to stop his advance, the words he used in making the request, and all the other circumstances of the case, it seems clear that the jury should have been given a chance to say whether or not this was manslaughter, and not be restricted to a cold issue of whether it was murder or self-defense, especially when, in the light

of all the facts there was evidence from which they might have deduced a finding of manslaughter.

"The failure of the court to charge upon manslaughter, if no other error is presented by the record, under the authorities of this court above cited, clearly entitled appellant to a reversal of this judgment."

I therefore respectfully enter my dissent.